**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 7, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GEORGE S. COHLMIA, JR., M.D.
and CARDIOVASCULAR
SURGICAL SPECIALISTS CORP., an
Oklahoma Corporation,

      Plaintiffs-Appellants,

v.

ST. JOHN MEDICAL CENTER,
HOWARD W. ALLRED, M.D., and
WILLIAM C. BURNETT, M.D.,

      Defendants-Appellees.

No. 09-5124

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 4:05-CV-00384-GKF-PJC)**

---

Michael L. Barkett, The Barkett Law Firm PLLC, Tulsa, Oklahoma, for
Appellants.

William H. Spitler, McDonald, McCann & Metcalf, LLP (G. Michael Lewis,
Doerner, Saunder, Daniels & Anderson, LLP, Tulsa, Oklahoma, and James W.
Conner, Jr., and Jason L. Glass, Richards & Connor, PLLP, Tulsa, Oklahoma,
with him on the brief), Tulsa, Oklahoma, for Appellees.

---

Before **TYMKOVICH**, **McKAY**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Dr. George Cohlmia, a cardiovascular and thoracic surgeon in the Tulsa, Oklahoma area, sued St. John Medical Center (SJMC) alleging a number of federal and state antitrust and business tort claims.[1] His claims followed SJMC's suspension of his medical privileges after a pair of surgeries, one resulting in death and another in permanent disfigurement. In response, SJMC asserted an affirmative defense that it was immune under federal law from damages pursuant to the Health Care Quality Improvement Act, 42 U.S.C. § 11101, *et seq.* (HCQIA). SJMC also moved for summary judgment on the antitrust and tort claims, arguing they failed for lack of evidentiary support.

The district court granted summary judgment on all claims, finding SJMC was immune from damages under the HCQIA, and further that Dr. Cohlmia had not met his burden of showing disputed facts that would demonstrate anticompetitive conduct or injury. Exercising jurisdiction under 28 U.S.C. § 1291, and after a thorough de novo review of the record, we AFFIRM the district court's grants of summary judgment, and the cost award to SJMC.

---

[1] Dr. Cohlmia initially included a number of additional defendants in his complaints, *see* Aplt. App. at 260–64, but those defendants settled prior to the disposition below. *See* Docket Entry 430 (05/18/2009). At this time, the only parties left in this case are Dr. Cohlmia and the corporate entity through which he practices, along with SJMC and two of its physicians in their individual capacities.

# I. Background

Dr. Cohlmia's claims arise from two distinct events. The first involves SJMC's suspension of his medical privileges following two surgeries performed at its hospital in June 2003. The second involves Dr. Cohlmia's attempts at developing a specialty heart hospital in 2001 and 2002.

## A. SJMC Surgeries

In June 2003, Dr. Cohlmia performed thoracotomy surgeries at SJMC on two patients diagnosed with lung cancer. One patient died seven days later and the other was permanently disfigured as a result of the surgery. Following a report of these results, Dr. Allred, SJMC Vice-President of Medical Affairs (and a physician specializing in colorectal surgery), conducted a review of the surgeries to assess whether any physician error was involved. During the course of his review of the surgeries, he interviewed a pathologist, a thoracic surgeon, the medical oncologist who treated one of the patients post-surgery, and a pulmonologist. Ultimately, Dr. Allred determined that "there was an inadequate workup . . . before [the patients] were operated on." Aple. Supp. App. at 1005. As a result, he and the members of the hospital's Medical Staff Executive Office concluded Dr. Cohlmia's treatment of the two patients demonstrated "significant error in clinical judgment," and that his continued practice at SJMC posed potential harm to patients. *Id.* at 1060–72. Exercising authority pursuant to the

SJMC Medical Staff Bylaws, Dr. Cohlmia's privileges to practice at SJMC were suspended.

Once informed of this decision, and in accordance with SJMC bylaws, Dr. Cohlmia immediately requested a formal hearing to respond to the concerns. Dr. Cohlmia met with Dr. Allred and David Pynn, the President of SJMC, prior to the hearing, but no resolution of the suspension issue was reached. At a three-day hearing in August 2003, presided over by former United States District Court Judge Thomas R. Brett, Dr. Cohlmia presented the testimony of seven physicians, including one expert, and SJMC presented the testimony of seven physicians, including three experts. Dr. Cohlmia testified at length during the hearing. In September 2003, Judge Brett issued a Report, Recommendation and Judgment, finding that the suspension of Dr. Cohlmia was "the result of a thorough review, by appropriate SJMC multidisciplinary medical staff physician specialists, of the medical records regarding major thoracic surgery procedures." *Id.* at 563. With respect to the patient who subsequently died, Judge Brett found that Dr. Cohlmia's actions demonstrated "a lack of sound medical judgment," and a "marked deviation from the recognized standard of care." *Id.* at 569. With respect to the patient who was disfigured, Judge Brett found that "Dr. Cohlmia's failure to employ extensive workup and staging prior to" the surgery "reflected a gross deviation in medical judgment." *Id.* at 574. Ultimately, Judge Brett concluded that SJMC "was justified for medical reasons in summarily suspending

Dr. Cohlmia's medical and surgical privileges pursuant to . . . SJMC By-laws." *Id.* at 574–75.

Subsequent to Judge Brett's findings, the Medical Executive Committee of the SJMC Medical Staff reviewed the Report and voted, thirteen to two, to uphold Dr. Cohlmia's suspension. The SJMC Board of Directors approved the Report as well, after giving Dr. Cohlmia another chance to present formal opposition to Judge Brett's findings. By November 2003, all of the review proceedings were concluded and Dr. Cohlmia's medical privileges were terminated.

### B. *Specialty Heart Hospital*

Prior to his initial suspension, Dr. Cohlmia participated in several business ventures that bear on the claims in this appeal.

In 1994, Dr. Cohlmia founded Cardiovascular Surgical Specialists Corp. (CVSS), the corporate entity through which he practices. CVSS, which employed a number of associate physicians in addition to Dr. Cohlmia, provided a variety of surgical services, including cardiovascular surgery, thoracic surgery, vascular surgery, and endovascular surgery. In June 2003, Dr. Cohlmia personally had active medical staff privileges at several hospitals in the Tulsa area: SJMC, Hillcrest Medical Center (HMC), Saint Francis, and SouthCrest.

In the spring of 2001, Dr. Cohlmia began exploring the idea of opening a specialty heart hospital in Tulsa. He retained the services of a consulting group, Technology Risk Management Group, along with other professionals to assist him

in this project (collectively, the Development Team). In February 2002, Saint Francis—where Dr. Cohlmia had privileges—announced its own plans to open a free-standing heart hospital, operating as a joint venture between Saint Francis and local physicians acting as investors. Many of the physician investors had previously been solicited by the Development Team as potential investors in Dr. Cohlmia's venture. In April 2002, the Development Team distributed a Private Placement Memorandum (PPM) to potential investors. The PPM included business plans, financial projections, organizational documents, and the terms under which investors could participate. Notably, the PPM also acknowledged Saint Francis's proposed heart hospital, describing it as "slightly larger," but "similar in scope of services as the one described in this offering." *Id.* at 1719.

Dr. Cohlmia's venture failed to attract any investors and the offer made by the PPM expired at the end of May 2002. The CEO of the consulting group retained by Dr. Cohlmia later stated that the venture failed because many potential investors were uncomfortable with the level of control that Dr. Cohlmia would have over the hospital, given that he was known "for not being able to maintain business associations," and that he "had been involved in litigation with a number of former business associates." *Id.* at 1919. In addition to having been beaten to the market by Saint Francis, the consultant offered his "professional opinion" that, by June 2002, it was clear that the venture "would not be successful." *Id.* at 1920.

Beginning in early 2003, HMC instituted a moratorium on certain high-risk, cardiovascular surgical procedures—procedures that Dr. Cohlmia performed on a regular basis. As a result of the moratorium, Dr. Cohlmia shifted much of his practice to SJMC. After learning of his suspension at SJMC, HMC also placed restrictions on Dr. Cohlmia's privileges in July 2003. In October 2004, after review of certain cases at HMC, the HMC Medical Executive Committee recommended that Dr. Cohlmia's privileges not be renewed. In April 2006, after several hearings and reviews—during which time Dr. Cohlmia continued to practice at HMC—the decision was affirmed. Additionally, Dr. Cohlmia voluntarily relinquished his privileges at SouthCrest and Saint Francis.[2]

While the review at HMC was ongoing, Dr. Cohlmia and Tahlequah City Hospital (TCH) formed a joint venture in Tahlequah, Oklahoma, where Dr. Cohlmia continues to practice at this time. He draws patients from the same market area that SJMC operates in, and he describes the venture as "successful," and with "excellent" results. *Id.* at 1297. He also continues to see patients out of a non-surgical office in Tulsa.

### C. Procedural History

Dr. Cohlmia filed his First Amended Complaint in September 2005, raising a number of claims. As a result of the dismissal and repleading of some claims,

---

[2] Dr. Cohlmia urges that he was "forced to withdraw" from these institutions as a result of "sham peer review" that was completed "for political purposes," Aplt. Br. at 24, but the record does not support this assertion.

the remaining claims before the district court below were: (1) violations of Sections 1 and 2 of the Sherman Antitrust Act, and Section 4 of the Clayton Act; (2) violations of the Oklahoma Antitrust Reform Act; and (3) tortious interference with contract and prospective advantage. SJMC asserted an affirmative defense pursuant to the HCQIA that it was immune from damages.

Dr. Cohlmia's claims survived a motion to dismiss, *Cohlmia v. Ardent Health Services, LLC*, 448 F. Supp. 2d 1253, 1265 (N.D. Okla. 2006) (*Cohlmia I*), but after discovery SJMC moved for summary judgment on all claims, as well as on its affirmative defense of HCQIA immunity. The district court broke the motion into three segments, receiving briefing on (1) the HCQIA defense; (2) the antitrust claims; and (3) the tort claims. The district court went on to grant all three summary judgment motions and award costs to SJMC. Dr. Cohlmia now appeals the grants of summary judgment, as well as the cost award.

## II. Discussion

Our review of the district court's order will begin with the question of HCQIA immunity, and then consider the federal antitrust claims followed by the state law claims. We conclude with the cost award. Our review of the district court's grants of summary judgment is de novo. *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004).

### A. HCQIA

Dr. Cohlmia first challenges the grant of HCQIA immunity. Enacted in 1986, HCQIA provides immunity to hospitals or doctors who perform peer reviews or challenges to professional conduct where patient care is at issue. HCQIA was adopted out of concern "that medical professionals who were sufficiently fearful of the threat of litigation will simply not do meaningful peer review, thus leaving patients at the mercy of people who should have been corrected or removed from their positions." IB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 19 n.1 (3d ed. 2006) (internal quotation omitted).

HCQIA provides immunity from "damages under any law of the United States or of any State . . . with respect to [a professional review] action." 42 U.S.C. § 11111(a)(1). A "professional review action" is "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." *Id*. at § 11151(9). The entity or persons that undertake the professional review are immune under HCQIA as long as they substantially comply with a list of objective standards set forth in the Act. *Id.* at § 11111(a)(1). The "immunity applies only to hospital or clinic dismissals in

-9-

which the subject's professional conduct is at issue. It creates no immunity whatsoever for purely 'commercial' terminations, such as dropping a specialist when a hospital enters into an exclusive agreement with a different specialist." IB Areeda & Hovenkamp 21.

The Act sets forth the procedures the professional review action should honor, and provides for immunity when actions are undertaken based on a reasonable belief that patient health is at issue. The immunity applies to actions taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
>
> (2) after a reasonable effort to obtain the facts of the matter;
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id.* at § 11112(a).

A professional review action is presumed to have met the standards for HCQIA immunity unless the presumption is rebutted by the preponderance of the evidence. *Id.* "Courts apply an objective standard in determining whether a peer

review action was reasonable under [§ 11112(a)]." *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir. 1996).

The district court focused its analysis on the fact that Dr. Cohlmia's evidence failed to rebut the presumption of regularity and concluded that no reasonable jury could find that Dr. Cohlmia had overcome the presumption. On appeal, Dr. Cohlmia argues the evidence would support an inference rebutting SJMC's procedures and reasonableness, relying solely on *Brown*.[3] In *Brown*, we held a plaintiff had successfully rebutted the HCQIA presumption at trial by presenting an expert who argued that the hospital's review of two cases prior to revoking the plaintiff-physician's privileges was unreasonably narrow and that the hospital should not be entitled to a presumption under the second factor, which provides immunity only after a "reasonable effort to obtain the facts of the matter." *Id.* at 1333–34.

---

[3] The district court distinguished *Brown* and rejected Dr. Cohlmia's reliance on the case, finding:

> It was clear in *Brown* that an economic competitor had instigated the review, made false misstatements to the National Practitioner Databank, that the doctor had been found negligent and the competitor testified against the plaintiff[. I]n that case there was overwhelming proof of conjuring up evidence against the doctor. Here, the evidence of ulterior motive is inferential and in this case the Court concludes that the plaintiff has not rebutted the presumptions set out under the statute.

Aplt. App. at 3123.

-11-

But two important differences exist between this appeal and *Brown*. First, *Brown* went to trial and the jury determined that the hospital should not be entitled to immunity under HCQIA. We were reviewing the hospital's argument that the district court failed to find it immune as a matter of law. We rejected that argument and affirmed, finding the disputed facts at trial would support the jury's verdict. *Id.* at 1334. Second, and more importantly, the district court below evaluated the record evidence presented by Dr. Cohlmia and found that it was not sufficient to rebut the HCQIA presumption *in this case*. In *Brown*, the claimed malpractice at issue developed over a long period of time, and could not be evaluated except through a lengthy review of the entire period, something the hospital failed to do. Here, in contrast, SJMC and the requisite reviewing bodies were only concerned with the two, acute patient incidents at issue that preceded Dr. Cohlmia's initial suspension.[4]

SJMC argues that the record is undisputed it undertook "reasonable efforts to obtain the facts of the matter before its Board made a final decision." Aple. Br. at 34. For example, SJMC brought in three independent, outside physician

---

[4] Likewise, *Brown* does not stand for the proposition that a mere battle of the experts is sufficient to overcome the presumption. "[W]hen the issue subject to peer review only concerns a single incident, summary suspension will inherently require less intensive fact finding and data compilation than would be the case with a review of a physician's care over several years." *Johnson v. Christus Spohn*, No. C-06-138, 2008 WL 375417, at *9 (S.D. Tex. Feb. 8, 2008). In *Johnson*, the court held that a hospital took reasonable efforts to obtain the facts when it investigated only one case, involving a lack of adequate and timely care for a chicken pox patient, prior to terminating a doctor's staff privileges.

experts to review the cases, and all testified under oath that the pre-surgery workup was inadequate and that the surgeries were unnecessary. SJMC also consulted a cardiac surgeon, a pathologist, a pulmonologist, and a medical oncologist in regards to the care Dr. Cohlmia provided, each of whom expressed concerns that the treatment of the two patients fell well below the standard of care required of a cardiothoracic surgeon. Finally, it retained an independent arbiter to review the evidence, and Judge Brett's report thoroughly documents and supports SJMC's methodology and conclusions.

In response, Dr. Cohlmia points to a memo written by Dr. Allred on June 26, 2003—prior to the suspension, but after the two surgeries were performed— criticizing Dr. Cohlmia's professional judgment. *See* Aplt. App. at 1333. In the memo, which appears to be a note for Dr. Allred's personal files detailing an in-person conversation he had with a colleague, Dr. Allred opines about a "significant problem" with Dr. Cohlmia's care and states: "[i]t is very difficult to remove someone from the staff once they have full privileges." *Id.* Dr. Cohlmia argues this memo is the best evidence showing that the suspension proceedings were merely a pretext in order to take away his privileges. He believes this is evidenced by the fact that the memo does not specifically mention the two cases that were then under review that precipitated the suspension in early July.

But it is unclear why this inference would follow from the memo. The memo is detailing a conversation that Dr. Allred had *already had* with a

-13-

colleague. Dr. Allred was listening to and responding to concerns articulated by another physician and Dr. Allred had not yet made public his concerns about the two surgeries. It would have been odd—and potentially a violation of privacy or medical ethics—for Dr. Allred to disclose his investigation to an unrelated physician prior to its completion, which did not occur until ten days later. We agree with the district court that nothing about the memo undercuts the thorough and independent review completed by SJMC in the course of its decision to terminate Dr. Cohlmia's medical staff privileges.

And, despite the allegations of bad faith, "[t]he real issue is the sufficiency of the basis for the [Hospital's] actions." *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1335 (11th Cir. 1994). It is the objective reasonableness of the review body's actions and determinations that count. And it is worth noting that Dr. Allred, who initiated the peer review investigation as a part of his position as Vice-President of Medical Affairs, is a colorectal surgeon and not a medical competitor of Dr. Cohlmia. But even if he were a competitor, application of HCQIA immunity is based on "the sufficiency of the basis for the [Hospital's] actions," and not *who* initiates the peer review process. *Id.* (quotation omitted); *see also* IB Areeda & Hovenkamp 21 n.6 (noting that peer review actions initiated

by a physician's competitors are permissible) (citing *Monroe v. AMI Hosps.*, 877 F. Supp. 1022, 1028–29 (S.D. Tex. 1994)).[5]

As the Eleventh Circuit has said, "[t]he role of federal courts on review of [HCQIA] actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." *Bryan*, 33 F.3d at 1337 (internal quotation omitted). Instead, "[t]he intent of [HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Id.*

The record does not rebut the presumption afforded SJMC by HCQIA. Accordingly, the district court did not err in granting summary judgment based on immunity under HCQIA.

### B. Other Federal and State Claims

Having found that SJMC's actions fall within the grant of immunity by HCQIA, we must determine the scope of that immunity. HCQIA grants immunity

---

[5] In addition, none of Dr. Cohlmia's direct competitors at SJMC participated in any stage of the peer review process. *See* Aple. Supp. App. at 545 and 1096 (identifying competitors as Drs. Garrett, Blankenship, and Fore); *id.* at 588, 1045, 1201–02, and 1204–05 (listing attendance at the various stages of review). As to expert review, during the hearing presided over by Judge Brett, SJMC engaged the services of a thoracic surgeon who was currently on an extended sabbatical from medical practice—so certainly not a competitor at the time. *See id.* at 691.

only against a monetary damage award, 42 U.S.C. § 11111(a)(1), but not claims for injunctive or other equitable relief. *See Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1031 (4th Cir. 1994) (reviewing the legislative history of HCQIA, and noting that the final language was meant to be limited to damages only because a broader protection "might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls").

In his complaint, Dr. Cohlmia sought injunctive relief and reinstatement of staff privileges, so we are required to review the merits of his federal and state claims. We agree with the district court that these claims lack merit, and we dispose of them for the same reasons.

### 1. *Federal Antitrust Claims*

Dr. Cohlmia's complaint raises claims under Sections 1 and 2 of the Sherman Antitrust Act, as well as Section 4 of the Clayton Antitrust Act.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. But "[i]ndependent action is not proscribed." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). "Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *AD/SAT v. AP*, 181 F.3d 216, 232 (2d Cir. 1999). Thus, "to survive [a] motion for summary judgment, the plaintiffs must first demonstrate the existence of an agreement, whether by direct or circumstantial evidence." *Mitchael v.*

*Intracorp, Inc.*, 179 F.3d 847, 856–57 (10th Cir. 1999).  And generally, the Sherman Act only prohibits unreasonable restraints on trade.  *See Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000).

Alternatively, Section 2 of the Sherman Act prohibits actions by "person[s] who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce."  15 U.S.C. § 2.  Unlike Section 1, Section 2 can be violated by a single economic unit without requiring any contract, combination, or conspiracy.  *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478, 482 (5th Cir. 1966).  But to do so requires "the possession of monopoly power in the relevant market and . . . the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

Section 4 of the Clayton Act addresses the question of "antitrust injury" and provides a remedy to "[a]ny person who shall be injured in his business by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15.  The expansive language is meant to "create a private enforcement mechanism . . . [to] deter violators and deprive them of the fruits of their illegal actions, and . . . provide ample compensation to the victims of antitrust violations."  *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982).

In evaluating Dr. Cohlmia's claims, the district court found that there was no evidence of antitrust injury, no injury in fact, no evidence of causation, and most importantly, no evidence that any conduct was anything other than unilateral. Dr. Cohlmia's appeal primarily takes issue with three of the district court's findings: (1) whether there was evidence of antitrust injury, (2) whether SJMC had sufficient market power, and (3) whether there was sufficient evidence of conspiracy.

### a. *Antitrust Injury*

To establish an antitrust injury, Dr. Cohlmia "must allege a business or property injury, an antitrust injury, as defined by the Sherman Act." *Tal v. Hogan*, 453 F.3d 1244, 1257–58 (10th Cir. 2006) (internal quotation omitted). "The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm" or individual. *Id.* at 1258. Additionally, "only buyers and sellers in the defendants' market are within the target of the antitrust laws." *Comet Mech. Contractors, Inc. v. E.A. Cowen Constr., Inc.*, 609 F.2d 404, 406 (10th Cir. 1980). Thus, an antitrust injury requires "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Tal*, 453 F.3d at 1253 (citation and quotation omitted).

Dr. Cohlmia contends that, acting through a "sham peer review process," SJMC and others conspired to exclude him from the market for cardiology

-18-

services in Tulsa. He argues his exclusion from the Tulsa marketplace, by itself, harmed competition by reducing the number of physicians available to provide the type of medical services he typically provides.

In support of this argument, he relies on the Supreme Court's decision in *Summit Health v. Pinhas*, 500 U.S. 322 (1991). In *Summit Health*, the Court considered the antitrust claim of an opthamologist whose medical privileges were revoked after he refused to use an assistant surgeon—resulting in higher costs for himself—during procedures that he performed at the hospital. The physician was known throughout the industry for his skill and speed in these types of surgeries, and he argued that requiring him to provide an assistant at his own cost was unnecessary and improper. *Id.* at 326–27. The hospital engaged in a peer review process that ended with the revocation of his medical privileges. The Court found the doctor's claims "that members of the peer review committee conspired with others to abuse th[e] process and thereby deny [him] access to the market . . . . ha[d] a sufficient nexus with interstate commerce to support federal jurisdiction." *Id.* at 333. Dr. Cohlmia argues the Court's decision applies here as well.

But *Summit Health* was decided on much narrower grounds. Rather than standing for the proposition that the "actual effect on the market is not controlling" and "the federal power to protect free markets may be exercised to punish conduct which threatens to impair competition even when no actual harm results," Aplt. Br. at 28, *Summit Health* was decided on purely jurisdictional

-19-

grounds. The Court was simply answering whether the case should survive a motion to dismiss for lack of federal jurisdiction, and was considering whether an opthamologist in the Los Angeles market was engaged in interstate commerce—the answer was yes. *Summit Health* does not stand for the proposition that the process SJMC used here injured competition.

Nor is there antitrust injury every time someone is excluded from a medical hospital as a result of peer review:

> A staffing decision does not itself constitute an antitrust injury. "If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from being so trivialized, *the reasonableness of a restraint is evaluated based on its impact on competition as a whole* within the relevant market."

*BCB Anesthesia Care Ltd. v. Passavant Mem'l Area Hosp. Ass'n.*, 36 F.3d 664, 669 (7th Cir. 1994) (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991)) (emphasis added). In order to recover, Dr. Cohlmia must show that *patients* are denied access to cardiology services in the relevant market. *See also Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.") (internal quotation omitted).

Based on these authorities, the question is whether harm to competition has been demonstrated. The district court found no credible evidence from which to

infer injury. Rather, the court concluded that "[Dr.] Cohlmia's loss of privileges at [SJMC] has [not] had market wide impact on the provision of any of the surgery or interventional cardiology services [he] claims to provide. Market wide prices, quantity or quality were not affected by [Dr.] Cohlmia's loss of privileges." Aplt. App. at 3124. We agree with this assessment of the record.

Finally, Dr. Cohlmia points to a Third Circuit case, *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995), for the proposition that the denial of medical staff privileges can injure competition. We do not quarrel with that general proposition. But although Dr. Cohlmia alleged facts in his complaint sufficient to survive a motion to dismiss—which is what the district court concluded in *Cohlmia I*—to overcome a motion for summary judgment, he must "meet his burden of presenting specific facts, by reference to specific exhibits in the record"; it is not the court's job to "comb the record in order to make" the non-movant's arguments for him. *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000). The court in *Brader* acknowledged as much: "[a]fter *Summit Health*, the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial." 64 F.3d at 876. Here, Dr. Cohlmia failed to show evidence of an

"impact on competition as a whole within the relevant market." *BCB Anesthesia Care*, 36 F.3d at 669 (internal quotation omitted).[6]

In sum, as the district court found, there is no record evidence of antitrust injury.

### b. *Market Share and Market Power*

Another element of an antitrust claim requires the plaintiff to show the defendant can wield "market power." To do so, a plaintiff must show evidence of either power to control prices or the power to exclude competition. *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 966 (10th Cir. 1990). Power over price and competition may depend on various market characteristics, such as "market trends, number and strength of other competitors, and entry barriers." *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 162 (10th Cir. 1986). "Market share is relevant to the determination of the existence of market or monopoly power, but market share alone is insufficient to establish market power." *Reazin*, 899 F.2d at 967 (internal quotation marks omitted). And the

---

[6] Dr. Cohlmia cites a number of other cases in support of his view that antitrust injury can be demonstrated without an "actual lessening of competition or an increase in prices." Aplt. Br. at 32 (quoting *Blue Shield of Virginia*, 457 U.S. at 482). But the cases he cites were primarily decided at the motion to dismiss stage when the court is still determining jurisdiction, and are predicated on a finding of "an abusive peer review process"—a finding we rejected above by concluding that SJMC is entitled to HCQIA immunity. *See Balaklaw v. Lovell*, 14 F.3d 793, 795 n.2 (2d Cir. 1994); *Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir. 1991); *Mishler v. St. Anthony's Hosp. Sys.*, 694 F.2d 1225 (10th Cir. 1981); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999).

absence of market share may give rise to a presumption that market power does not exist. *Id.* at 969–70.

Dr. Cohlmia's expert testified that SJMC controlled between 15.8% and 19.3% of the market, and SJMC does not dispute this quantitative conclusion. From this testimony, Dr. Cohlmia argues that market share "between 17% and 25% . . . is sufficient to show monopoly power." Aplt. Br. at 34 (citing *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987)). But as SJMC notes, this is hardly a bright-line, or even a commonly accepted, metric. *See Reazin,* 899 F.2d at 968 (We have not determined "a firm market share percentage . . . before a finding of monopoly power can ever be sustained. We prefer the view that market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power."); *see also Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989) ("While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70% and 80%."). Thus, while high market shares may give rise to presumptions of market power, a market share of less than 20% is woefully short under any metric from which to infer market power. *See also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) ("[U]ndisputed evidence of low market share may make monopolization an impossibility as a matter of law."); IIB

Areeda & Hovenkamp 250 ("We . . . presume that market shares below 50 or 60 percent do not constitute monopoly power . . . . [and e]ven without an absolute rule, a clear presumption will almost always be decisive.").

Given the low market share at issue here, Dr. Cohlmia argues he can still demonstrate market power by showing "other compelling structural evidence . . . to support monopolization." *Dimmitt Agri.. Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir. 1984). Since the market share percentages held by SJMC are well shy of *clear* market power, in determining whether there is any "other compelling structural evidence," we consider the strength of competition and the difficulty or ease of entry into the market. *Shoppin' Bag*, 783 F.2d at 162.

With respect to the strength of competition, there are four hospital systems in Tulsa that perform the types of surgeries at issue and SJMC is not even the largest—Saint Francis is. In addition, a specialty heart hospital operated by Saint Francis competed with SJMC, HMC, and SouthCrest at the relevant times here. While performing surgery is a capital-intensive process, for a market the size of Tulsa, four hospital systems do not indicate significant market power by any one player. To the contrary, the record shows each participant in Tulsa had a roughly equivalent share of the market, and no one entity was exercising market power.[7]

_____

[7] Additionally, we disagree with Dr. Cohlmia's citation to *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440 (9th Cir. 1988), for the proposition that anti-competitive behavior by a hospital can evidence antitrust injury for "two different segments of the economy. . . . the market in which anesthesia providers

(continued...)

-24-

As to barriers of entry, SJMC points out that fourteen new surgeons have entered the market since 1994, with many of them being recruited by Dr. Cohlmia. While Dr. Cohlmia makes a legitimate argument that exclusion by one hospital can lead to a domino effect of exclusion by other hospitals, he still does not overcome the fact that the mishandled surgeries justified SJMC's peer review. And as we discussed above, the peer review process resulted in a suspension decision affirmed by a neutral evaluator. The peer review process is no more an entry barrier than any standard requiring professionals to maintain certain professional credentials.

Assuming that SJMC lacked the requisite market power, Dr. Cohlmia's claims may still be pursued for those Section 1 violations that do not require a showing of market power. Thus, a demonstration of anticompetitive conduct can be based on actual adverse effects to competition. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

Dr. Cohlmia's claim falls short here as well. He points to SJMC's "concerted refusal to deal with Plaintiff and the coercion of patients." Aplt. Br. at 36. But he is not *entitled* to practice at SJMC or any other hospital; and he

---

[7](...continued)
compete for staff privileges . . . [and] the patient market for anesthesia services." *Id.* at 1447. While the Ninth Circuit did so hold, the facts in *Oltz* indicate that St. Peter's had an 84% market share for surgical services. *Id.* at 1442. In such a case, an exclusive agreement to exclude the plaintiff from the market—where such a large showing of market share is demonstrated and conceded by the defendants—is fair evidence of antitrust injury.

never explains how his patients were coerced by SJMC. If he is referring to a reduction of choice in the market for physicians, that argument is simply circular and refers back to his claims of market power, which he cannot support.

In sum, we agree with the district court that Dr. Cohlmia has not demonstrated SJMC has sufficient market power to control prices or exclude competition.

### c. Proof of Conspiracy

An inference of conspiracy is impermissible if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986).

Dr. Cohlmia argues he demonstrated ample evidence of conspiracy, and that the district court failed to consider his evidence taken as a whole, rather than individually. Dr. Cohlmia's arguments are predicated on his belief that SJMC was conspiring against him to block his specialty heart hospital—an unsuccessful venture that failed to attract any investors. Dr. Cohlmia's claims are speculative at best, and even viewing these arguments in the best light possible, there is simply no evidence of an actual conspiracy. For the same reasons as the district court, we agree summary judgment on the conspiracy claims was proper.

In sum, the district court did not err in granting summary judgment on the federal antitrust claims.

### *2. State Antitrust Claims*

Next, we turn to Dr. Cohlmia's state antitrust claims.

Under the Oklahoma Antitrust Reform Act, it is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within the state. Okla. Stat. Tit. 79 § 203(B). This is essentially the same as the federal test and, as with those claims, the district court properly awarded summary judgment.

One notable difference though, is that it is unlawful for any person in control of an *essential facility* to unreasonably refuse to give a competitor access if the effect of such refusal is to injure competition. *Id.* at § 203(C). An "essential facility" is, among other things, a facility "which is controlled by an entity that possesses monopoly power." *Id.* at § 203(D)(3)(a).

As discussed above, SJMC lacked monopoly power, so for the same reasons, the state law claim fails. In addition, Dr. Cohlmia had privileges at several of the other local hospitals at the time of his suspension from SJMC, so he was not "locked out," Aplt. Br. at 10, of an essential facility, as required by the Act. And it is not anti-competitive for a hospital to restrict privileges of medical professionals deemed unsafe to practice in a facility. *See Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1370 (W.D. Pa. 1982) (reasoning that it would be "inappropriate to apply a doctrine which would prevent a hospital from keeping doctors it had adjudged unqualified off of its staff").

Dr. Cohlmia points to an Oklahoma case where the court struck down a contractual provision preventing a surgeon from practicing within a 20-mile radius of Tulsa. *Cardiovascular Surgical Specialists, Corp. v. Mammana*, 61 P.3d 210, 214–15 (Okla. 2002). But that case involved an onerous non-compete agreement (ironically, drafted by Dr. Cohlmia's corporate entity, a defendant in the case) that completely excluded the surgeon from the market for two years. In finding anti-competitive activity, the court was clear that the non-compete *effectively* banned the surgeon "from practicing . . . within 100 miles" of the community where he had previously been employed, and was "much broader than necessary to protect any legitimate interest of" his former employer. *Id.* at 214. In this case, SJMC has properly received HCQIA immunity, and, at the time of his suspension, Dr. Cohlmia had staff privileges at several other area hospitals where he could practice. The record is clear that Dr. Cohlmia was upset with this turn of events, but he ultimately chose to *voluntarily* resign his privileges at two hospitals and move his primary practice to Tahlequah—which is still in the market area as defined by his own expert. There is simply no basis to conclude that SJMC violated Oklahoma state antitrust law or specifically, the "essential facility" doctrine.[8]

---

[8] Dr. Cohlmia refers back to the district court's opinion denying SJMC's motion to dismiss, *Cohlmia I*, as evidence of "the misuse of the peer review process." Aplt. Br. at 37. But the district court was ruling on Dr. Cohlmia's motion to dismiss—which is based on different evidentiary standards than a

(continued...)

In sum, the district court properly granted summary judgment to SJMC on Dr. Cohlmia's state antitrust claims. Although he presented a coherent theory to survive an initial motion to dismiss, once discovery was completed, the record lacked sufficient evidence to support his claims.

### 3. Tortious Interference with Contract

Dr. Cohlmia also contends the district court erred in dismissing his tortious interference with contract claim. We disagree.

To state a claim for tortious interference with business or contractual relations, the plaintiff must show: (1) he or she had a business or contractual right that was interfered with; (2) the interference was malicious and wrongful and was not justified, privileged, or excused; and (3) damage was proximately sustained as a result of the interference. *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979).

Dr. Cohlmia claims that SJMC interfered with his contracts with two groups: his patients and an insurer, Blue Cross/Blue Shield.

### a. Patient Contracts

As to interference with patient contracts, Dr. Cohlmia argues that, at the time SJMC suspended his privileges, both he and his patients were forced to leave

---

[8](...continued)
ruling for summary judgment. In this appeal, we review the grant of summary judgment based on whether Dr. Cohlmia has marshaled record evidence to support his claims, not mere allegations of wrongful conduct.

the Tulsa market in order to continue treatment. As SJMC points out, the

relationship between a doctor and a patient is at-will; there is no contract at issue.

*See also Vesom v. Atchison Hosp. Ass'n*, 279 F. App. 624, 640 (10th Cir. 2008)

(finding that to recover, plaintiff must show a "contractual relationship or

exclusive arrangement with his patients on which to base his prospective loss").

Dr. Cohlmia acknowledges this point, but argues that as a result of SJMC's

conduct, his interactions with patients were made "more burdensome or

expensive." Aplt. Br. at 46; *see also John A. Henry & Co., v. T. G. & Y. Stores

Co.*, 941 F.2d 1068, 1071–72 (10th Cir. 1991). SJMC counters that Dr. Cohlmia

presented no evidence to support these allegations, and, at the time of his

suspension, Dr. Cohlmia had privileges at three other local hospital systems

where he could serve his patients.[9] Aple. Br. at 49.

The district court held that Dr. Cohlmia failed to offer proof of his damages

and damages are not automatically presumed on the basis of a loss of privileges.

Aplt. App. at 701–02. In rebutting this determination, Dr. Cohlmia relies on the

Fifth Circuit's decision in *Kiepfer v. Beller*, 944 F.2d 1213, 1220 (5th Cir. 1991),

which held that a physician can establish sufficient evidence for a tortious

interference claim by showing that defendant physicians interfered with his ability

---

[9] Dr. Cohlmia disputes this characterization, stating that the area hospitals were "already taking measures to deny [his] privileges," in a "secret" review process. Aplt. Rep. Br. at 14. But even so, his privileges were still intact *at the time of* SJMC's suspension. And in any event, as discussed below, Dr. Cohlmia failed to provide proof of his damages, which is required for recovery.

to obtain patient referrals.  But in that case, the doctor at trial "sufficiently proved that his damages—the complete loss of his referral practice—was a proximate result of the [tortious interference.]"  *Id.* at 1220.

Here, there is no evidence demonstrating a loss of patients or monetary damages.  But Dr. Cohlmia argues that the district court improperly denied his request to submit an expert report detailing his damages.  The court rejected the report because Dr. Cohlmia failed to comply with the requirements of Federal Rule of Civil Procedure 56(f), by not filing an affidavit indicating that he was unable to present facts essential to justify his opposition to summary judgment.[10]  Given that he failed to comply with the Rules, it was not an abuse of discretion for the district court to reject Dr. Cohlmia's filing based on his failure to comply with Rule 56(f).[11]

### b.  *Insurance Contracts*

As with his patients, Dr. Cohlmia fails to provide evidence of economic damage to his relationship with Blue Cross/Blue Shield.  The only reference in Dr. Cohlmia's briefs to this issue is that he "had to undergo appellate procedures to remain available under the Blue Cross/Blue Shield insurance plans of

---

[10]  In 2010, Rule 56(f) was amended and the substance is now embodied in Rule 56(d) instead.  For simplicity's sake, we refer to Rule 56(f) to comport with the record in this case.

[11]  The merits of this evidentiary report are discussed in greater detail below in subsection 4.

-31-

thousands of patients." Aplt. Br. at 45. While not specifically explained, it appears Dr. Cohlmia is arguing that, once his privileges were suspended at one hospital, he had to be "recertified" by other hospitals, to continue as a provider in the insurance system. While this likely imposed some time cost, as with his allegations as to patient interference, Dr. Cohlmia failed to properly submit evidence detailing his losses.

Accordingly, the district court did not err in its grant of summary judgment with respect to tortious interference with contract.

### 4. *Intentional Interference with Prospective Economic Advantage*

Dr. Cohlmia's final claim contends that SJMC wrongfully interfered with his medical practice.

To state a claim for malicious interference with prospective business relations, the plaintiff must show: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) an intentional interference including or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. *Boyle Services, Inc. v. Dewberry Design Group, Inc.*, 24 P.3d 878, 880 (Okla. Civ. App. 2001). In order to prevail, the plaintiff must show that the defendant used "some intentional or improper conduct or means." *Overbeck v. Quaker Life Ins. Co.*, 757 P.2d 846, 848 (Okla. Civ. App. 1984).

-32-

Dr. Cohlmia identified two business expectancies that he claims were interfered with by SJMC: (1) potential new patients, and (2) potential lost profits from his specialty heart hospital venture.

The new patient claim suffers from the same defects discussed above regarding the insufficiency of evidence relating to existing patients, and need not be restated here.

As to the lost profits claim, Dr. Cohlmia claims SJMC was attempting to frustrate his efforts to build and operate a new specialty heart hospital in the Tulsa area. The district court found that this claim also suffered from "the absence of proof of damages." Aplt. App. at 702.

Claims for damages based on future profits are generally prohibited since they are typically uncertain and speculative. *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) (citations omitted). Oklahoma state law holds that when a party seeks to recover loss of future profits, the profits should be coming from an established business that shows with some certainty the future losses. *Plummer v. Fogley*, 363 P.2d 238, 241 (Okla. 1961).

Dr. Cohlmia submitted an expert report to establish future profits, but the court ruled that the report was inadmissible because Dr. Cohlmia failed to comply with the requirements of Rule 56(f). *See* Aplt. App. at 701-02 (ruling); 1480 (report). Even if the court had received the report, SJMC argues that it "does not speak to the certainty of profits, but is an extrapolation of tax returns and reliance

on a pro forma (which is not part of the record and itself hearsay and unreasonable)." Aple. Br. at 54.

We agree. The expert report relies on economic projections going out several years detailing Dr. Cohlmia's expected profits from his specialty heart hospital, but such projections are speculative at best. Given that the consultant retained by Dr. Cohlmia for the specialty heart hospital project concluded that the project "would not be successful" in June 2002—over a year before SJMC's suspension of Dr. Cohlmia—and that Dr. Cohlmia failed to attract a *single investor* after distributing his PPM, the district court did not err in concluding Oklahoma law required more evidence to support a damage award.

The district court did not err in granting summary judgment with respect to the intentional interference with prospective economic advantage claim.

### 5. *Various Other Motions*

As noted above, Dr. Cohlmia's arguments realize the meager state of the record regarding damages. But he argues that the district court erred by overruling his motions to supplement the record. Unfortunately, Dr. Cohlmia does not explain *why* the district court erred and simply points to cases showing that summary judgment reversal is necessary when error occurs.

The district court was well within its discretion to reject Dr. Cohlmia's motions for the simple fact that he did not comply with the required procedures

for submission.  Additionally, there is nothing here to suggest that they were so substantively important that the outcome in this case would have been different.

### C.  Cost Award

Federal Rule of Civil Procedure 54 "creates a presumption that the district court will award costs to the prevailing party," and the district court "must provide a valid reason for denying such costs."  *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1144, 1147 (10th Cir. 2009).  A prevailing party bears the burden of establishing the costs to which it is entitled, *Allison v. Bank One-Denver*, 289 F.3d 1223, 1248 (10th Cir. 2002), and the amount "must be reasonable."  *Callicrate v. Farmland Indus.*, 139 F.3d 1336, 1339 (10th Cir. 1998).  But once the burden is met, the "burden shifts to the non-prevailing party to overcome the presumption that these costs will be taxed."  *In re Williams*, 558 F.3d at 1148.

We review the legal analysis providing the basis for a fee award de novo, *W. Am. Ins. Co. v. AV&S*, 145 F.3d 1224, 1230 (10th Cir. 1998), and the amount of a fee or cost award for an abuse of discretion, *Anchondo v. Anderson, Crenshaw & Assocs., LLC*, 616 F.3d 1098, 1101 (10th Cir. 2010).

Dr. Cohlmia argues that the district court erred by (1) awarding costs to SJMC in the first instance; and (2) even if awarding costs were legally proper, the amount awarded was unreasonable.  He argues the district court imputed certain costs that had been borne by other defendants to SJMC when calculating their

expenses—a problem because other defendants previously settled, and the various parties agreed to bear their own costs as a part of that settlement. SJMC disagrees, arguing that it only ever sought recovery for the costs that it paid out of pocket.

Dr. Cohlmia points to the copying costs as especially egregious, but as SJMC notes, at the time of the fee award, the case had spanned over four years, with almost 300,000 pages of discovery produced by SJMC at a cost of almost $20,000. We have previously held that "the burden of justifying copy costs is not a high one. A prevailing party need not justify each copy it makes. . . . [but, instead] demonstrate to the district court that, under the particular circumstances, the copies were reasonably necessary for use in the case." *In re Williams*, 558 F.3d at 1149 (internal quotation marks omitted).

The district court was in the best position to determine the reasonable necessity of the copying cost award, and the record is clear that the court rejected Dr. Cohlmia's argument that SJMC only be awarded 3/16 of their proposed costs (an argument presumably raised because SJMC accounted for 3/16 of the original defendants). As the record and the district court made clear, "[t]he costs sought by defendants were actual out-of-pocket costs. They are entitled to recover these costs provided they were reasonably necessary to the litigation of the case." Aplt. App. at 3423.

Nothing in the record indicates that the district court's cost award was unreasonable. Accordingly, we AFFIRM the district court's cost award.

## III. Conclusion

Based on the foregoing analysis, we AFFIRM the district court's grants of summary judgment and the cost award to SJMC.