HOLMES, Circuit Judge,
concurring:
I join the per curiam opinion that affirms the judgment of the district court. I write separately to explicate my reasoning for concluding that JetAway has failed to establish an antitrust injury and, consequently, lacks antitrust standing to bring this action.
In 2005, the County decided to privatize FBO services at the Airport and requested proposals from private parties. The BOCC received two proposals—one from JetAway and one from JCP. When JCP was selected to provide FBO services at the Airport, JetAway filed the instant lawsuit, alleging that Defendants violated the Sherman Act by manipulating the selection process and excluding JetAway from competing in the FBO services market at the Airport. The district court granted summary judgment in Defendants’ favor, con- *828 eluding, inter alia, that JetAway lacked antitrust standing. I would affirm.
I
A
Despite the voluminous record and extensive discovery undertaken in this case, the facts necessary to decide this appeal are relatively few. The difficulties among the parties arose from JetAway’s efforts to obtain the right to serve as an FBO at the Airport, which the County runs. An FBO is a commercial business that provides a variety of aircraft-related services, such as fueling, hangaring, parking, aircraft rental, aircraft maintenance, and flight instruction. From 1991 to January 2006, the County ran the FBO at the Airport.
The BOCC is the governing authority for the County and consists of three members. Beginning in 2002, the BOCC began discussing the need to expand FBO services at the Airport and whether it should privatize these operations. Around the same time, Mr. Scott and Defendants Mr. Rumble and Mr. Egan considered forming JCP for the purpose of operating an FBO at the Airport in the event the County privatized FBO services. In early 2002, Mr. Scott provided the BOCC with a draft request-for-proposal (“RFP”) form for the BOCC to use in soliciting bids if it chose to privatize FBO services. Moreover, on April 5 of that year, JCP submitted an unsolicited proposal to the BOCC to be selected as the FBO for the Airport, which was not accepted. In the following years, JCP lobbied for privatization of the FBO services at the Airport. JetAway also was in favor of privatization.
The three members of the BOCC were up for re-election in November 2004. At least two candidates publicly endorsed privatization of FBO services at the Airport: Bill Patterson and Allan Belt. Mr. Patterson and Mr. Belt won two of the three BOCC seats in the November 2004 election and, shortly thereafter, met with Mr. Scott and Mr. Rumble regarding this potential privatization. But support for privatization was not unanimous; in fact, an external consulting firm concluded that the County would economically benefit from continuing to operate the FBO at the Airport.
Also in 2004, JetAway purchased property adjacent to the Airport, from which it began operations as a “through-the-fence” FBO service provider. From this property, JetAway provided non-fuel-related FBO services to the Airport—which, in JetAway’s view, placed it in a strong position to be selected by the County as the Airport’s FBO if FBO services were privatized.
In early 2005, the BOCC decided that the County should privatize FBO services at the Airport. It therefore published an RFP for a private, on-Airport FBO service provider. The County reserved the right to negotiate with one, two, or several parties that might submit proposals, as well as the right to reject all proposals. The RFP also required each proposal to adhere to the Airport’s minimum standards, which at that time explicitly forbade “through-the-fence” commercial operations such as Jet-Away’s.
The County formed an independent committee to evaluate the FBO proposals that were submitted and to make a recommendation to the BOCC regarding whether it should accept one or more of the proposals or decline to privatize FBO operations at the Airport. As it turned out, the County only received two proposals— one from JetAway and one from JCP. Upon evaluation of the proposals, the independent committee recommended against privatizing FBO services at the Airport. Nevertheless, the BOCC voted to enter *829 into negotiations with JCP, even though JetAway’s proposal guaranteed a significantly higher payment to the County than JCP’s initial proposal.
On December 5, 2005, the County officially privatized FBO services at the Airport and entered into an FBO agreement with JCP that permitted JCP to provide these services on Airport property. That same day, with the assistance of Mr. Scott, the County adopted revised minimum standards for the Airport. Many of these reformulated standards, according to JetA-way, made it difficult (if not impossible) for JetAway or any other FBO service provider to effectively compete with JCP.
Despite these setbacks, JetAway continued to negotiate with the County in an attempt to become a second FBO service provider at the Airport. But according to JetAway, the County and JCP were determined to thwart its efforts to compete with JCP in the FBO services market. For example, JetAway has provided evidence that County Attorney Robert Hill was in communication with JCP regarding JetA-way’s proposal to the BOCC to acquire on-Airport land from which to operate its FB O-services business and that Mr. Hill advised JCP to take action in light of this information to prevent JetAway’s acquisition of the land. In the end, the BOCC rejected JetAway’s proposals.
JCP began to provide on-Airport FBO services in January 2006. Around this time, JetAway was fueling aircraft on-Airport without the County’s consent. In November 2008, the County sought a preliminary injunction to terminate JetAway’s access to the Airport, alleging that JetA-way violated several Airport safety rules in the course of running its business. The state court agreed with the County and issued a preliminary injunction. Thereafter, the County prevented JetAway from accessing Airport property, and JetAway’s off-Airport operation has been closed ever since.
B
JetAway filed the instant action against Defendants in December 2007, alleging violations of §§ 1 and 2 of the Sherman Act and, pursuant to 42 U.S.C. § 1983, violations of the Equal Protection Clause and the Commerce Clause.[1] Non-Governmental Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, inter alia, that the Noerr-Pennington doctrine[2] shielded them from liability. The district court denied their motion, concluding, inter alia, that the Noerr-Pennington doctrine did not apply.
Governmental Defendants then moved for summary judgment on all of JetAway’s claims. As to JetAway’s antitrust claims, *830 Governmental Defendants argued that these claims failed as a matter of law and that Defendants were entitled to state-action immunity.[3] The district court denied the motion and, instead, granted Jet-Away’s motion for additional discovery.
Defendants subsequently filed a second motion for summary judgment, which the district court granted as to all claims. The district court concluded that JetAway’s claims under the Equal Protection and Commerce Clauses were meritless. As to JetAway’s antitrust claims, the district court concluded this time that the Noerr-Pennington doctrine shielded Non-Governmental Defendants from antitrust liability.
Most important for purposes of this appeal, the district court concluded that Jet-Away did not have antitrust standing to bring any of its antitrust claims. The district court reached this conclusion by focusing on the report of JetAway’s antitrust expert, Dr. Philip B. Nelson, which stated that the demand for FBO services at the Airport was only sufficient to support one FBO service provider. In light of Dr. Nelson’s report, the court reasoned that “[i]n essence, [JetAway] admits that the size of the business opportunity at the Airport limits that market to a single FBO operator.” Aplt.App. at 6865 (Mem. Op. & Order, filed Mar. 28, 2012).
The district court acknowledged JetA-way’s contention that “the defendants’ protection of JCP from later entry by JetA-way has caused injury to the users of the Airport by subjecting them to higher prices and inferior services.” Id. However, drawing further on Dr. Nelson’s report concerning the timing of such competition, the court concluded that any competition between JetAway and JCP would have been relatively short-lived. Specifically, the court stated that “while there may be a period of competition between two competing [FBOs], for a limited time, perhaps one year, the market can sustain only one operator.” Id. It reasoned that the possibility of such temporary competition did not militate in favor of a finding of antitrust injury. In this regard, the court stated, “It is well established law that the anti-competitive conduct that violates the Sherman Act must have more than a temporary effect on the market.” Id.
The district court thus ultimately determined that, because ordinarily the Sherman Act does not protect one monopolist from the efforts of another aspiring monopolist to replace it, JetAway could not establish that Defendants caused an antitrust injury. Consequently, JetAway could not establish antitrust standing. The court’s antitrust-standing determination was sufficient to shut the door on JetAway’s antitrust claims. However, the court proceeded to reach the merits of those claims. Among other things, the court observed: “[T]he allegation is that the County had selected JCP to be the FBO operator even before issuing the RFP. The disputed evidence may support that finding. That, however, is not illegal [under the antitrust laws].” Id. at 6863. The court further opined, “It may be that the Commissioners who signed the FBO agreement with JCP did not act in the best interest of their constituents and permit *831 ted themselves to be unduly influenced by personalities. That is a matter of political concern; it is not an antitrust conspiracy.” Id. at 6866. In sum, the district court ruled that Defendants were “entitled to summary judgment of dismissal of the claims of violation of Sections 1 and 2 of the Sherman Act.” Id. at 6868.
JetAway appeals from the district court’s grant of summary judgment to Defendants. Governmental Defendants cross-appeal the district court’s decision denying them state-action immunity.
II
This court “reviewfs] a grant of summary judgment de novo, applying the same standard as the district court.” Automax Hyundai S., LLC v. Zurich Am. Ins. Co., 720 F.3d 798, 803 (10th Cir.2013) (quoting Oldenkamp v. United Am. Ins. Co., 619 F.3d 1243, 1246 (10th Cir.2010)) (internal quotation marks omitted). Summary judgment is proper “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). “There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.” Koessel v. Sublette Cnty. Sheriff’s Dep’t, 717 F.3d 736, 742 (10th Cir.2013) (quoting Bones v. Honeywell Int’l, Inc., 366 F.3d 869, 875 (10th Cir.2004)) (internal quotation marks omitted).
III
JetAway focuses all of its efforts on appeal on its antitrust claims.[4] The parties vigorously dispute several aspects of the district court’s decision with respect to those claims. However, it is necessary to address only one issue to resolve this case: whether JetAway has established an antitrust injury. Under the controlling law, I conclude that it has not. Consequently, as I see it, JetAway lacks antitrust standing, and the district court’s decision must be affirmed. See, e.g., Expert Masonry, Inc. v. Boone Cnty., 440 F.3d 336, 348 (6th Cir.2006) (“Although the district court granted summary judgment based on its analysis of state action immunity, we explicitly do not reach the question of immunity because we find that the lack of any alleged antitrust injury is more than sufficient to affirm summary judgment here.”); Fischer v. NWA, Inc., 883 F.2d 594, 599 (8th Cir.1989) (“We affirm the district court. However, we do so on different grounds: the failure of Fischer to establish that it suffered an antitrust injury as a result of Northwest’s acquisition of Republic.”); see also IIA Phillip E. Areeda et al., Antitrust Law ¶ 335f, at 73 (3d ed.2007) [hereinafter “Areeda”] (“[Cjourts usually address standing first because they can often decide standing more readily than liability before trial.”).
A
Section 4 of the Clayton Act gives private parties, such as JetAway, the power to enforce federal antitrust laws. See 15 U.S.C. § 15(a) (“[A]ny person who shall be injured in his business or property by rea *832 son of anything forbidden in the antitrust laws may sue therefor.”); accord Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1254 (10th Cir.2003). Here, JetAway brought its federal antitrust claims pursuant to both §§ 1 and 2 of the Sherman Act. Section 1 of the Sherman Act prohibits, inter alia, “contract[s]” or a “conspiracy” “in restraint of trade or commerce,” 15 U.S.C. § 1,[5] while § 2 prohibits the “monopoliz[ation], or attempt to monopolize ... trade or commerce,”[6] id. § 2. See Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1280 (10th Cir.2012) (discussing the requirements of, and differences between, §§ 1 and 2 of the Sherman Act); Elliott Indus., 407 F.3d at 1123-24 & nn. 29-30 (setting forth the elements of claims made pursuant to §§ 1 and 2 of the Sherman Act).
To pursue such claims under § 4 of the Clayton Act, a plaintiff must demonstrate not only that it has standing under Article III of the Constitution, but also that it has antitrust standing.[7] See Tal, 453 F.3d at 1253; Elliott Indus., 407 F.3d at 1124. The requirements of antitrust standing “are more rigorous than [those] of the Constitution,” Tal, 453 F.3d at 1253; a plaintiff “must show (1) an ‘antitrust injury’; and (2) a direct causal connection between that injury and a defendant’s violation of the antitrust laws,”[8] Ashley Creek, 315 F.3d at *833 1254 (quoting Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 882 (10th Cir.1997)) (internal quotation marks omitted); accord Tal, 453 F.3d at 1253.
Whether a plaintiff has suffered an antitrust injury is a “threshold inquiry.”[9] Abraham, 461 F.3d at 1267; see Rural Tel. Serv. Co. v. Feist Publ’ns, Inc., 957 F.2d 765, 768 (10th Cir.1992) (noting that a “plaintiff must show causal antitrust injury”); Fischer, 883 F.2d at 599 (“Unless it can establish that its alleged injury was caused by conduct that violates the antitrust laws, a plaintiff lacks standing, under Section 4 of the Clayton Act, to bring an antitrust lawsuit.”). This threshold requirement “ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.” B-S Steel of Kan., Inc. v. Tex. Indus., Inc., 439 F.3d 653, 667 (10th Cir.2006) (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)) (internal quotation marks omitted); see also Yavar Bathaee, Note, Developing an Antitrust Injury Requirement for Injunc-tive Relief that Reflects the Probability of Anticompetitive Harm, 13 Fordham J. Corp. & Fin. L. 329, 331 (2008) (“The antitrust injury requirement is an integral part of the antitrust standing inquiry. While antitrust standing determines whether the correct plaintiff is before the court, the antitrust injury doctrine ensures that injuries redressed by the Clayton Act are injuries against which the antitrust laws were meant to protect.” (footnote omitted)); cf. Davis, supra, at 723 (“Very simply, the doctrine of antitrust injury requires a court to examine not only whether the acts the defendant allegedly committed violate the law but also why they violate the law.”).
Put another way, an antitrust injury is “an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants’ acts unlawful.” Tal, 453 F.3d at 1253 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (internal quotation marks omitted); accord Cohlmia, 693 F.3d at 1280; Elliott Indus., 407 F.3d at 1124; Reazin, 899 F.2d at 962 n. 15; see also Bathaee, supra, at 335 (“To determine whether an antitrust injury exists, one must understand what protections antitrust laws were meant to afford.”). It is therefore critical to set forth precisely what type of injury the antitrust laws were intended to prevent. See, e.g., Davis, supra, at 723 (“The [antitrust-injury] doctrine, in other words, directs a court to examine, in a proper case, what economic effects the case law rule or statute in *834 question seeks to prevent.”); Bathaee, supra, at 335 (“The antitrust injury analysis requires that courts examine the injury sustained, the purpose of the antitrust laws creating the cause of action, and the causal link between the two.”).
“The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.” Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); cf. United States v. Syufy Enters., 903 F.2d 659, 663 (9th Cir.1990) (“If, as the metaphor goes, a market economy is governed by an invisible hand, competition is surely the brass knuckles by which it enforces its decisions”). This proposition applies with full force as to both §§ 1 and 2 of the Sherman Act. Compare Syufy Enters., 903 F.2d at 663 (discussing the Sherman Act’s focus on competition in a § 2 case), with Atl. Richfield Co., 495 U.S. at 342, 110 S.Ct. 1884 (stating that § 1 asks “whether a restraint [on competition] is ‘unreasonable,’ i.e., whether its anticompetitive effects outweigh its pro-competitive effects”), and Nat’l Soc’y of Prof'l Eng’rs v. United States, 435 U.S. 679, 690, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (stating that the § 1 “inquiry is confined to a consideration of impact on competitive conditions”).
Moreover, the Sherman Act’s goal of preventing unfair competition is pursued with an eye toward safeguarding the benefits that consumers derive from a competitive marketplace. See Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1073 (10th Cir.2013) (“The bottom line, then, is that antitrust evinces a belief that independent, profit-maximizing firms and competition between them are generally good things for consumers.... Experience teaches that independent firms competing against one another is almost always good for the consumer and thus warrants a strong presumption of legality.”), cert. denied, - U.S. -, 134 S.Ct. 1947, 188 L.Ed.2d 976 (2014); see also Fishman v. Estate of Wirtz, 807 F.2d 520, 535 (7th Cir.1986) (“[T]he enhancement of consumer welfare is an important policy—probably the paramount policy—informing the antitrust laws.”); Robert H. Bork, The Antitrust Paradox 61 (1978) (“The legislative history of the Sherman Act ... displays the clear and exclusive policy intention of promoting consumer welfare.”).
Generally speaking, “the antitrust laws ... protect competition, not competitors.” Fischer, 883 F.2d at 599-600; see Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am., 885 F.2d 683, 697 (10th Cir.1989) (“[T]he Supreme Court, in a now oft quoted phrase, has stated ‘the antitrust laws ... were enacted for the protection of competition not competitors.’ ” (omission in original) (quoting Pueblo Bowl-O-Mat, 429 U.S. at 488, 97 S.Ct. 690) (internal quotation marks omitted)); see also Spectrum Sports, 506 U.S. at 458, 113 S.Ct. 884 (“[The Sherman Act focuses on competition] not out of solicitude for private concerns but out of concern for the public interest.”); Novell, 731 F.3d at 1078 (“Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition.... ”); Cohlmia, 693 F.3d at 1280 (“The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm or individual.” (quoting Tal, 453 F.3d at 1258) (internal quotation marks omitted)); SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 972 (10th Cir.1994) (“The Sherman Act ultimately must protect competition, not a competitor, and were we tempted to collapse the distinction, we would distort its continuing viability to safeguard consumer welfare.”). As such, “[a] producer’s loss is *835 no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.” SCFC ILC, 36 F.3d at 972 (quoting Stamatakis Indus., Inc. v. King, 965 F.2d 469, 471 (7th Cir.1992)) (internal quotation marks omitted).
In accord with these principles, the Sherman Act is not concerned with overly aggressive business practices, or even conduct that is otherwise illegal, so as long as it does not unfairly harm competition. See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr., 582 F.3d 1216, 1225 (10th Cir.2009) (“After all, it is the ‘protection of competition or prevention of monopoly[] which is plainly the concern of the Sherman Act,’ not the vindication of general ‘notions of fair dealing,’ which are the subject of many other laws at both the federal and state level.” (alteration in original) (quoting IIIB Areeda, supra, ¶7706, at 190)); Expert Masonry, 440 F.3d at 348 (“The parties may break a host of state or federal laws and regulations in making a side deal or in otherwise circumventing the bidding process in reaching a final arrangement, but they do not breach Section 1 of the Sherman Act where the alleged vertical agreements involve only one buyer and one seller.”).
Thus, consonant with the Sherman Act’s statutory concerns, “[t]he antitrust injury-requirement ensures that a plaintiff can recover only if [its injury] stems from a competition-reducing aspect or effect of the defendant’s behavior.” Elliott Indus., 407 F.3d at 1124-25 (first alteration in original) (quoting Atl. Richfield Co., 495 U.S. at 344, 110 S.Ct. 1884) (internal quotation marks omitted); see Michael A. Carrier, A Tort-Based Causation Framework for Antitrust Analysis, 77 Antitrust L.J. 991, 997 (2011) (“The legal aspect of antitrust injury doctrine has been important in limiting cases in which the plaintiff cannot show harm related to reduced competition.”).
B
JetAway contends that it suffered an antitrust injury because Defendants engaged in anticompetitive behavior in the FBO services market by manipulating the bid process rather than allowing market forces to determine which company was the superior FBO service provider. More specifically, JetAway argues that once the County sent out the RFP—initiating an ostensibly competitive bid process—then, in fact, it had “to be a fair and competitive bid process; it [could not] be manipulated.” Oral Argument at 3:28, JetAway Aviation, LLC v. Bd. of Cnty. Comm’rs (Nos.12-1173, 12-1194). JetAway asserts that Defendants engaged in precisely such manipulation, unfairly putting a finger on the scales in favor of JCP. The unlawful result, as JetAway sees it, is that it was kept out of the Airport’s FBO services market and not permitted to compete head-to-head with JCP.
As previously stated, the district court disagreed, reasoning as follows. Based on the report from JetAway’s own expert, Dr. Nelson, the market for FBO services at the Airport could only sustain one FBO service provider,[10] and because ordinarily the antitrust laws do not prevent one rno- *836 nopolist from taking the place of another, there could be no harm to competition from such substitution and thus no antitrust injury. Even assuming that, but for Defendants’ allegedly anticompetitive conduct, there would have been a period of competition between JCP and JetAway, the district court concluded that this too did not establish an antitrust injury, because the competitive period would have been limited (perhaps to one year) and, ultimately, only one of the two FBOs would have emerged as the FBO service provider in the Airport market. The district court essentially concluded that, even if Defendants in some way manipulated the FBO selection process or if their conduct was otherwise unfair, such conduct did not affect competition, and thus JetA-way did not suffer an antitrust injury.
For the reasons that follow, I am in substantial agreement with the district court. The district court appropriately identified the material facts that are not genuinely disputed and, in my view, applied sound legal principles to those facts in concluding that JetAway could not establish an antitrust injury. Therefore, like the district court, I conclude that JetAway lacks antitrust standing.[11]
1
Notably, the district court’s universe of genuinely undisputed material facts was based in large part on the testimony of JetAway’s own expert, Dr. Nelson. In his report, Dr. Nelson set forth the “structural characteristics” of the relevant market, which he defined as the market for FBO services at the Airport. ApltApp. at 3186 (Expert Report of Philip B. Nelson, Ph.D., dated July 15, 2011) (capitalization altered). He noted that, following Defendants’ allegedly anticompetitive conduct, “JCP [was] the only competitor in the relevant market[], which implies that its market share [was] 100%.” Id. Next, he analyzed the likelihood of other entrants into this market and concluded that other than JetAway, there were no probable entrants. Important for purposes of this appeal is one of the bases for Dr. Nelson’s conclusion—namely, that “[t]here [was] only enough demand for FBO services at the Airport to support one FBO.” Id. at 3190. Thus, according to Dr. Nelson, the market could only support one FBO provider; it would be either JCP or JetAway.
As a foundation for his assessment of damages, Dr. Nelson reiterated this conclusion; “But for the alleged anticompeti-tive conduct related to the contract selection process, JetAway would likely have been the only FBO at [the Airport].” Id. at 3200 (capitalization altered) (internal quotation marks omitted). Dr. Nelson *837 made this determination via several subsidiary conclusions. First, he reasoned that JCP would not have entered the market if JetAway had, because JCP would have operated at a loss. Second, he again recognized that “[t]here [was] not enough demand for FBO services to support two FBOs in the [long run]” at the Airport. Id. at 3201 (capitalization altered). Finally, he concluded that “[i]f JetAway and JCP both entered [the market] in January 2006, JetAway was more likely to survive” due to the various competitive advantages JetAway had over JCP. Id.
Dr. Nelson summarized his position as follows: “but for the alleged unlawful behavior, JetAway would have negotiated with the County after submitting its RFP response and would have been selected as the sole FBO at Montrose Airport (or JCP would have decided not to compete if it had also been selected).” Id. at 3203. He explained that, in the “less likely event” that JCP decided to enter the market anyway and compete with JetAway, “there would have been a short period” of competition that would have led to a reduction in JetAway’s profits “associated with this short competitive period.” Id. at 3203 n. 377 (emphases added). He then calculated the “but-for” damages as if JetAway had been the only FBO service provider from January 2006 forward. Alternatively, Dr. Nelson projected JetAway’s damages if, as a result of this litigation, JetAway were permitted to enter the market in January 2012. Under that scenario, Dr. Nelson recognized that “JCP might not immediately stop operations,” so he assumed that “JCP would continue to operate its business at a loss for one year before ceasing operations.” Id. at 3208 (emphasis added).
JetAway attempts on appeal to undermine its own expert’s characterization of the market in several ways, none of which are availing. First, JetAway argues that there is a genuine dispute of material fact as to whether the FBO services market at the Airport would inevitably be controlled by a monopolist. But the evidence on which JetAway relies does not cast doubt on Dr. Nelson’s conclusions.'
JetAway specifically points to JCP’s representations to the County that two FBOs could compete at the Airport. In May 2005, the County asked JCP whether it would still consider its FBO services proposal viable if the County were “obligated to allow additional FBO operators.” Id. at 6679 (Letter from Cnty. to JCP, dated May 27, 2005). JCP responded that the presence of additional FBO providers “would not necessarily change the viability of’ its proposal, so long as potential competitors were subject to the same requirements as JCP, because JCP intended to outperform the competition. Id. at 6682 (Letter from JCP to Cnty., dated May 31, 2005). JetAway also cites the County’s representations to the Federal Aviation Administration (“FAA”) that a second FBO operator at the Airport would be feasible.
However, as I see it, this evidence is not inconsistent with Dr. Nelson’s report and does not create a genuine dispute of material fact. This is so because Dr. Nelson’s report expressly contemplated that JCP and JetAway might occupy the market together as competitors, but concluded that this circumstance would only briefly exist. Ultimately, as suggested by that expert report, the market would be perforce controlled by a lone monopolist. Therefore, JCP’s and the County’s representations regarding the feasibility of a second FBO in the market are in no way inconsistent with Dr. Nelson’s ultimate, critical conclusion that “[t]here is only enough demand for FBO services at the Airport to support one FBO.” Id.- at 3190. Expressed another way, any seeming in *838 consistency between Defendants’ representations and Dr. Nelson’s conclusion evaporates when one considers the matter of timing: Dr. Nelson recognized the possibility of two FBOs competing in the Airport’s FBO services market; he simply concluded that any period of competition generated by the second FBO would be short-lived.
JetAway attempts, however, to cast doubt on whether any period of competition that might have occurred actually would have been short. To do so, JetA-way points to evidence that the County and another company simultaneously provided FBO services at the Airport for a three-year period during the late 1980s and early 1990s. But evidence of a three-year period of competition approximately fifteen years before the time period at issue here does not place in dispute Dr. Nelson’s conclusion that, as the market stood at the relevant time, a short period of competition between JCP and JetAway would quickly have driven one of the two out of business.
Finally, JetAway argues that Dr. Nelson’s one-year estimate regarding the period of possible competition between JCP and JetAway was made only for purposes of estimating damages, and thus the true period of competition that would have resulted between the two FBOs is unknown. However, it was not the precise period of competition between the two FBOs that the district court deemed to be the material fact; rather, it was the fact that any such period of competition would have been short. And Dr. Nelson’s report unequivocally supports the notion that any period of competition, at most, would have been short.
Thus, even disregarding the one-year figure, the record was not silent or uncertain concerning the period of any competition. It is that “short”—or, as the district court called it, “limited”—time frame of competition, and not the more specific one-year period, that formed the predicate for the district court’s legal conclusion that the timing of any competition did not advance JetAway’s cause to establish antitrust injury. See id. at 6865 (stating that “while there may be a period of competition between two competing [FBOs], for a limited time, perhaps one year, the market can sustain only one operator” (emphasis added)). Therefore, the district court’s legal reasoning had support in the record concerning the length of any competition.
2
In my view, the district court correctly determined that applying these antitrust principles to the genuinely undisputed material facts—most notably, the facts coming from the testimony of JetAway’s own expert, Dr. Nelson—doomed JetAway’s effort to demonstrate an antitrust injury.
a
To start, the district court correctly understood that the mere fact that one monopolist is able to successfully replace another does not harm competition and, therefore, does not effect an antitrust injury. See Herbert Hovenkamp, Federal Antitrust Policy 663 (4th ed.2011) [hereinafter “Hovenkamp”] (“[I]f the plaintiffs only claim is of the nature T, rather than the defendant, was entitled to be the monopolist,’ then the plaintiff is not a victim of antitrust injury.”); see also Fishman, 807 F.2d at 538 (“Without more, the substitution of one competitor for another does not implicate the antitrust laws.”). The rationale for this is simple: while there is harm to the monopolist who is replaced, there is no harm to the level of competition in the market. See Columbia River People’s Util. Dist. v. Portland Gen. Elec. Co., 217 F.3d 1187, 1190 (9th Cir. *839 2000) (holding that there cannot be a § 1 violation when one monopolist utility seeks to replace another in a “monopoly market” because this only affects competitors, not competition; “consumers will still buy electricity and a utility will still produce it”).
Regardless of which entity controls a monopoly, it remains “free to reduce output and increase prices, the standard evils of monopoly power.” HyPoint Tech., Inc. v. Hewlett-Packard Co., 949 F.2d 874, 878 (6th Cir.1991). But it is well-established that the possession of monopoly power alone, “and the concomitant charging of monopoly prices,” is not itself unlawful; an antitrust plaintiff must show that the possession of monopoly power “is accompanied by an element of anticompetitive conduct.” Verizon Commc’ns Inc. v. Lato Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (emphasis omitted); see also 2 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation (MB) § 25.02, at 25-11-25-14 (2d ed. 2013) (“Section 2 does not outlaw all monopolies. Section 2 does not condemn mere size or market dominance. Nor does monopoly power in and of itself offend Section 2. It is the acquisition, maintenance, or exercise of monopoly power—not its mere existence—-that violates Section 2.” (footnotes omitted)). And there can be no anticom-petitive conduct—that is, harm to competition—in situations where the sole act in question is the replacement of one monopolist by another, as either monopolist can equally “exploit[ ] a monopoly.” See Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 267 (7th Cir.1984). This is why ordinarily the mere act of one monopolist replacing another “is a matter of indifference” to the antitrust laws. Id.; see id. at 266 (“[Ajlthough it hurts the lawful owner of the monopoly power,” the “mere[] shifting of] a lawful monopoly into different hands ... has no antitrust significance.”); Oxford Global Res., Inc. v. Weekley-Cessnun, No. Civ.A.3:04-CV-0330-N, 2004 WL 2599898, at *3 (N.D.Tex. Nov. 12, 2004) (“The antitrust laws ... are completely indifferent to the transfer of existing monopoly power.”).[12]
*840 Therefore, in sum, it is clear that a defeated monopolist cannot establish an antitrust injury simply by pointing to the victory of the “substitute monopolist.” See Hovenkamp, supra, at 663; see also Almeda Mall, 615 F.2d at 353-54 (holding that there was no antitrust injury because the “mere substitution” of an electricity reseller for the electric company selling directly to consumers did not affect competition (internal quotation marks omitted)); Digital Sun v. Toro Co., No. 10-CV-4567-LHK, 2011 WL 1044502, at *4 (N.D.Cal. Mar. 22, 2011) (relying on Columbia River to hold that there was no antitrust injury when the holder of an exclusive seller’s license was “simply ... replaced” when the license was transferred to another entity); cf. Four Corners, 582 F.3d at 1226 (holding that the denial of an opportunity “to share in [the defendant’s] putative monopoly” was insufficient to establish antitrust injury because even though “[the plaintiff] ... might be better off with such a shared monopoly, ... there’s no guarantee consumers would be”). The district court correctly discerned the legal import of the genuinely undisputed facts that it identified in the testimony of Dr. Nelson relating to the substitution of one monopolist for another in the Airport’s FBO services market.
b
The district court also correctly discerned the legal significance of the undisputed material facts regarding the second critical point. Specifically, there was no genuine dispute (as discussed supra) that if there were a period of competition between JetAway and JCP, it would have been a short one. The court rightly determined that this meant that any purported deprivation of consumers of the benefits of such competition was of no material significance for purposes of determining the presence of antitrust injury. Putting the *841 court’s legal conclusion in context, I note that JetAway has argued vigorously that its exclusion from the market had anticom-petitive effects of concern to the antitrust laws because its exclusion prevented consumers from benefitting from what JetA-way expected to be an intense price competition with JCP.
In particular, JetAway asserts that there is no dispute that “JetAway’s entry to the market would have led to significant reductions in prices for FBO services at the Airport, if not an all-out price war.” Aplt. Opening Br. at 33; see also Aplt. Reply Br. at 14-15 (“Defendants also claim that even if prices did decrease, such a decrease would last only one year, which is not a sufficient length of time to constitute harm to competition.... [T]his diminishes the competitive importance of the drop in prices that consumers would have enjoyed during that period of time”). In effect, JetAway reasons that Defendants’ purported anticompetitive conduct in excluding JetAway from the Airport’s FBO services market should be found to have harmed consumers and caused an antitrust injury because it denied consumers the benefits (notably, lower prices) of direct competition between JetAway and JCP— even if those benefits would have only been of limited duration (that is, temporary). I find it pellucid, however, that the district court’s contrary reasoning was firmly rooted in settled principles of antitrust law.
In divining the presence of an antitrust injury, courts have disregarded temporary anticompetitive effects. See Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947, 952 (9th Cir.1998) (holding that to establish an antitrust injury, there must be “significant and more-than-temporary harmful effects on competition,” and that the four- to ten-month harm alleged was “temporary” and thus insufficient (quoting Am. Profl Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Profl Publ’ns, Inc., 108 F.3d 1147, 1151 (9th Cir.1997)) (internal quotation marks omitted)); Colo. Interstate Gas Co., 885 F.2d at 697 (holding that “unfair methods of competition that only threaten to have a transitory impact on the marketplace” do not violate the antitrust laws). This is because the Sherman Act is concerned only with conduct that has “long-run anti-competitive effects.” Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); see Colo. Interstate Gas Co., 885 F.2d at 697 (requiring a § 2 plaintiff “to show that an attempted monopolist’s conduct threatened to create substantial and persistent changes in the marketplace” and recognizing that such a test “may allow some unfair and potentially harmful methods of competition to go unpunished by the antitrust laws” (emphasis added) (footnote omitted)); cf. Adaptive Power Solutions, 141 F.3d at 952 (“To constitute an injury to competition, the restraint must be of significant magnitude and more than trivial.” (citation omitted) (internal quotation marks omitted)).
Were temporary effects on competition sufficient, an “ordinary business tort” and an antitrust violation would often be indistinguishable. See IIIB Areeda, supra, ¶ 782a, at 321 (explaining that to avoid invoking § 2 of the Sherman Act “on the basis of torts with insignificant market effects[,] ... [t]he antitrust court must ... insist on a preliminary showing of significant and more than temporary harmful effects on competition”); see also Colo. Interstate Gas Co., 885 F.2d at 697 n. 26 (recognizing that the Sherman Act is not meant to remedy torts and that “[i]n attempting to distinguish between conduct that should be addressed by the antitrust laws and conduct which should be regulated by tort law, ... ‘[t]he antitrust court *842 must ... insist on ... significant and more-than-temporary harmful effects on competition ’ ” (third omission in original) (quoting Phillip Areeda & Donald Turner, Antitrust Law ¶ 737b (1978))); cf. Novell, 731 F.3d at 1079-80 (“Business torts generally, and acts of fraud more particularly, can sometimes give rise to antitrust liability. At least when the defendant’s deceptive actions—usually aimed at third parties in the marketplace—are so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors.” (emphasis added)). In sum, if the effect on competition is not more than temporary or “transitory,” it is of no concern to the antitrust laws. See Colo. Interstate Gas Co., 885 F.2d at 697.
Consequently, in discerning the presence of unlawful anticompetitive conduct, courts have focused on the long-term impact of firm conduct on prices, even when the short-term effects might appear (at first blush) to be beneficial to consumers. See Atl. Richfield Co., 495 U.S. at 337 n. 7, 110 S.Ct. 1884 (“Rivals cannot be excluded in the long run by a nonpredatory maximum-price scheme unless they are relatively inefficient.”); id. at 351, 110 S.Ct. 1884 (Stevens, J., dissenting) (“[Njotwith-standing any temporary benefit to consumers, the unlawful pricing practice that is harmful in the long run to competition causes ‘antitrust injury’ for which a competitor may seek damages.”); Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 121 n. 17, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (“[T]he likelihood that predatory pricing will benefit the predator is ‘inherently uncertain: the short-run loss [from pricing below cost] is definite, but the long-run gain depends on successfully neutralizing the competition ... [and] on maintaining monopoly power for long enough both to recoup the predator’s losses and to harvest some additional gain.’ ” (omission and second and third alterations in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))); United States v. AMR Corp., 335 F.3d 1109, 1114 (10th Cir.2003) (same); MCI Commc’ns Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1181 (7th Cir.1983) (“The most blatant predatory use of monopoly power theoretically is, of course, a quick price cut upon entry until the competitor withdraws, at which time prices are raised back to monopoly levels to recoup the temporary losses sustained.”); see also William J. Baumol, Quasi-Permanence of Pnce Reductions: A Policy for Prevention of Predatory Pricing, 89 Yale L.J. 1, 26 (1979) (“An attempt to provide a universally acceptable definition for a vague term such as ‘predatory pricing’ probably can contribute little. However, the term does relate to a problem that is real and significant—the design of means to permit full and fair competitive measures by the established firm, without foreclosure of entry. The problem clearly involves inter-temporal behavior patterns that cannot be addressed adequately by the comparison of prices and costs at any single moment.” (emphasis added) (footnote omitted)); F.M. Scherer, Predatory Pricing Under Section 2 of the Sherman Act, 89 Harv. L.Rev. 868, 885 (1976) (“The essence of exclusionary pricing is sacrificing profits today to enhance market power, prices, and profits tomorrow. If future prices will be higher relative to costs than they would have been in the absence of today’s price cutting, any correct reckoning of the welfare effects of exclusionary pricing must take into account the future efficiency losses as well as current gains or losses.”).
Here, the anticompetitive effects were the product of Defendants’ allegedly improper exclusion of JetAway from the Airport’s FBO services market, where JetA- *843 way would have engaged in head-to-head competition with JCP and purportedly produced lower prices for consumers. But, if that competition and the resulting lower prices would have been temporary, it naturally follows under the controlling law that the anticompetitive effects of Defendants’ conduct that prevented the competition from taking place would have been temporary as well.
In other words, the benefits flowing to consumers from a competitive FBO services market and the anticompetitive effects of Defendants’ allegedly unlawful conduct—which prevented such a competitive marketplace from emerging—were, in a sense, two sides of the same coin. And, importantly, the coin was made of perishable stuff. After the competition between JetAway and JCP ceased, the market would naturally have become once again the preserve of a sole monopolistic firm— and, as noted, the existence of a monopoly is not itself anticompetitive or a violation of the antitrust laws.[13] See, e.g., Trinko, 540 U.S. at 407, 124 S.Ct. 872; see generally von Kalinowski, supra, § 25.02. Therefore, under settled principles of antitrust law, the district court correctly reasoned that, because any competition between Jet-Away and JCP in the Airport’s FBO services market would have been of limited duration, the anticompetitive effects associated with the absence of that competition were not a material variable in the antitrust-injury calculus and did not help Jet-Away to establish an antitrust injury.
3
In sum, the foregoing evidence demonstrates that JetAway cannot establish antitrust injury and thus cannot establish antitrust standing. The undisputed evidence reveals that the FBO services market would be controlled by a monopolist because there was insufficient demand for FBO services at the Airport to support two FBO firms. As discussed supra, ordinarily the identity of the monopolist is of no concern to the antitrust laws because the simple act of one monopolist replacing another does not adversely affect competition. See Columbia River, 217 F.3d at 1190;[14] Brunswick Corp., 752 F.2d at 266- *844 68; Hovenkamp, supra, at 663. In the unlikely event that a period of competition between the two conceivable firms—JetA-way and JCP—ensued, it would have been short and would not have had any long-term effects on the FBO services market. Such a brief period of competition would not have altered the competitive landscape. Consequently, like the identity of the monopolist, ordinarily it would be of no concern to the antitrust laws. See Adaptive Power Solutions, 141 F.3d at 952;[15] Colo. Interstate Gas Co., 885 F.2d at 697; see also IIIB Areeda, supra, ¶ 782a, at 321-22. Accordingly, I would hold that JetAway has failed to establish that Defendants’ conduct effected an antitrust injury; therefore, it does not have antitrust standing to bring its antitrust claims. See Tal, 453 F.3d at 1253; Elliott Indus., 407 F.3d at 1124.
C
Next, I would expressly address and reject two broad lines of argument advanced by JetAway by which it seeks to undermine the district court’s conclusion that it has not established an antitrust injury.
1
Relying on this court’s decision in Full Draw Productions v. Easton Sports, Inc., 182 F.3d 745 (10th Cir.1999), JetAway argues that “[cjonduct that eliminates one of two competitors or excludes a potential competitor from a relevant market harms competition.” Aplt. Opening Br. at 29. I have no doubt that under certain circumstances, such as those in Full Draw, this is true. Such circumstances, however, are not present here.
A brief examination of the facts and reasoning in Full Draw demonstrates why its conclusion is not controlling here. In Full Draw, the plaintiff was an archery trade-show promoter who brought an antitrust suit against several defendants who were archery-product manufacturers and distributors and also a trade association to which the other defendants belonged. See 182 F.3d at 747-48. After the plaintiff rejected the trade association’s offer to purchase the plaintiff’s trade show, the trade association began its own trade show to rival the plaintiffs. See id. at 748. Following two years of competition between the two trade-show organizers, the *845 trade association and the other defendants allegedly organized a group boycott of the plaintiffs trade show and drove it from the market. See id. We held that the defendants’ conduct injured competition, stating, “We have no doubt that alleging the loss of one of two competitors in this case alleges injury to competition.” Id. at 754 (emphasis added).
According to JetAway, the reasoning of Full Draw prompts the same conclusion here. As was true in Full Draw, says JetAway, there were two competitors in the Airport’s FBO services market—it and JCP—and Defendants’ anticompetitive conduct effectively precluded JetAway from competing in the market. However, the structure of the market in Full Draw was markedly different than the structure here—notably, prior to the commencement of the allegedly anticompetitive conduct, consumers in Full Draw had a meaningful choice between two competitors, and we found this fact to be significant in evaluating whether the defendants’ conduct produced an antitrust injury. In that regard, we reasoned:
In particular, as alleged in the second amended complaint, from 1995 to 1997, both [the trade association] and the [plaintiff] competed for customers for their 1997 trade shows. Thus, from the market’s perspective, there were actually two competitors during that period. As a direct result of defendants’ boycott, [the plaintiff] was driven from the market in 1997, thereby depriving consumers of their pre-existing choices in that market. Because defendants’ alleged boycott reduced a competitive market of two producers to a market of one monopolist, [the plaintiff] quite clearly alleged substantial injury to competition from defendants’ group boycott.
Id. (emphasis added).
It should be patent that the effects of the defendants’ allegedly anticompetitive conduct in Full Draw differ from the effects of Defendants’ allegedly anticompeti-tive conduct on the FBO services market here. As detailed above, the undisputed evidence is that, in all events, there would only be one FBO service provider at the Airport. This was not because of Defendants’ conduct, but because “[t]here is only enough demand for FBO services at the Airport to support one FBO.” Aplt.App. at 3190. The natural composition of the market here consists of one FBO—that is, one monopolist. Thus, unlike in Full Draw, Defendants’ allegedly anticompetitive conduct did not have the effect of “reducing] a ... market of two [service providers] to a market of one monopolist,” 182 F.3d at 754; rather, the structure of the market itself dictated that there could be no more than one firm (i.e., monopolist). In other words, unlike the situation in Full Draw, Defendants’ conduct did not change the composition of the FBO services market such that competition was reduced and an antitrust injury was effected. See Christy Sports, 555 F.3d at 1197-98 (distinguishing Full Draw on the grounds that in Full Draw, the “defendants actively invaded another market through anticompetitive behavior and substantially changed what that market looked like”). More specifically, Defendants’ conduct did not deprive consumers of a meaningful, long-term choice between two competitors. At most, by virtue of their allegedly anticompetitive conduct, Defendants in- this case selected which of two competing FBO service providers would be installed as the monopolist in a market that could only support one FBO service provider. As explained supra, such a shifting of a “monopoly into different hands ... has no antitrust significance.” Brunswick Corp., 752 F.2d at 266; see Columbia River, 217 F.3d at 1190; Hovenkamp, supra, at 663. Thus, *846 in my view, Full Draw is distinguishable, and JetAway’s reliance on it is misplaced.
2
JetAway’s final attempt to carry its burden of demonstrating an antitrust injury is also unavailing. It argues that the requisite harm to competition needed to show antitrust injury is evinced by the decline in the quality and quantity of the FBO services at the Airport that occurred as a result of Defendants’ exclusion of JetAway from the market.[16]
Specifically, JetAway contends that, had Defendants not excluded it from the market, it would have provided higher quality FBO services than JCP and more of them. JetAway further claims it would have done so even after it drove JCP from the market and was the sole monopolistic firm, because of its superior facilities and Airport location. Thus, reasons JetAway, Defendants’ anticompetitive conduct harmed consumers. This argument is legally infirm. Most saliently, even if JetAway would have been a better monopolist for consumers in the sense that it would have provided a more diverse, higher-quality array of FBO services, it cannot be said that Defendants’ conduct harmed competition; thus JetAway cannot establish an antitrust injury. Cf. Davis, supra, at 742 (“Choosing A over B as one’s exclusive distributor for a territory is not an antitrust violation at all, because whether A is chosen or B is chosen, competition remains the same. There was no predicate antitrust violation.” (footnote omitted)).
It is true, as JetAway contends, that “[a]n antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.” Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir.1996) (internal quotation marks omitted); accord Cohlmia, 693 F.3d at 1281. But the primary import of such a statement is that an antitrust plaintiff must prove harm to the market’s competitive landscape, rather than harm flowing only to itself. Courts do look to whether the alleged anticompetitive conduct adversely affected, inter alia, the “quantity or quality of goods or services,” but only for clues as to whether there have been effects “on competition as a whole within *847 the relevant market.” Id. (emphasis omitted) (citations omitted) (internal quotation marks omitted). Merely pointing to a decline in the quality or quantity, of goods or services does not establish the presence of an antitrust injury absent injury to competition. See Christy Sports, 555 F.3d at 1199 (holding that allegations that the defendant’s conduct resulted in “a decline in quantity and increase in price” of the product at issue did not demonstrate that the defendant’s conduct had “anticompeti-tive effects” because none of the defendant’s underlying conduct was itself anti-competitive).
Such changes in quantity and quality in the market may well be the consequences of harm to competition—viz., the presence of such changes may provide the foundation for a reasonable inference that competitive harm is also present. See, e.g., Syufy Enters., 903 F.2d at 668 (“[Cjompe-tition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits. When a producer is shielded from competition, he is likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal.”). However, it does not ineluctably follow that competition has been adversely affected whenever there has been a diminishment in the quality or quantity of goods or services in the market. Put another way, a decline in consumer benefits in a given case is not necessarily traceable to an injury to competition. See Fishman, 807 F.2d at 536 (“The antitrust laws are concerned with the competitive process, and their application does not depend in each particular ease upon the ultimate demonstrable consumer effect. A healthy and unimpaired competitive process is presumed to be in the consumer interest.”); id. at 538 (“The fact that the precise impact of defendants’ conduct on the broad consuming public has remained unfocused here does not prevent a finding that the antitrust laws have been violated.”); see also Christy Sports, 555 F.3d at 1199 (finding no harm to competition despite allegations of increased prices and decreased output).
Were this court to find antitrust injury whenever a would—be monopolist maintains that in a particular case it would be a better monopolist for consumers than the incumbent monopolist due to the comparative quality of the goods or services that it would provide, we would lose sight of the injury that the antitrust laws are meant to guard against—injury to competition— which “[experience teaches ... is almost always good for the consumer.” Novell, 731 F.3d at 1073; see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (“[T]he Sherman Act was enacted to assure customers the benefits of ... competition.”). Thus, homing in on injury to competition, the relevant question becomes whether the conduct at issue has reduced competition. Elliott Indus., 407 F.3d at 1124-25 (“[T]he antitrust injury requirement ensures that a plaintiff can recover only if [its injury] stems from a competition-reducing aspect or effect of the defendant’s behavior.” (internal quotation marks omitted)); see Spectrum Sports, 506 U.S. at 458, 113 S.Ct. 884 (noting the Sherman Act’s focus on “conduct which unfairly tends to destroy competition”); see also City of Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 266-67 (3d Cir.1998) (“[B]e-cause neither the agreement nor the proposed merger had brought about the lessening of competition in a ‘marketplace’ where there was no competition, there was no antitrust injury.”). As I have explicated in Part III.B.2, supra, there is no evidence here that Defendants’ conduct reduced competition.
*848 It becomes clear, then, that JetAway actually calls upon this panel to engage in the wrong inquiry. Specifically, rather than asking for an evaluation of whether there would be a reduction in competition, JetAway asks the panel to evaluate whether it would have been a better monopolist than JCP. This is akin to asking a court to decide what company deserves to be the monopolist in a given market, which is not an appropriate area of judicial inquiry under the antitrust laws. See, e.g., Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co., 730 F.Supp. 826, 933 (C.D.Ill.1990) (“It is also not a legitimate business justification [for antitrust purposes] to suggest that the defendant would be a ‘better’ provider of the particular product or service than its competitors.”).
Notably, the thrust of JetAwa/s argument—that the quality and quantity of a monopolist’s products and services should be deemed relevant to the antitrust-injury inquiry—is directly at odds with the principle that the identity of a monopolist is of no concern to antitrust law. See, e.g., Brunswick Corp., 752 F.2d at 266 (noting that “merely shift[ing] a lawful monopoly into different hands ... has no antitrust significance”); Hovenkamp, supra, at 663 (“[I]f the plaintiffs only claim is of the nature T, rather than the defendant, was entitled to be the monopolist,’ then the plaintiff is not a victim of antitrust injury.”). Under JetAway’s argument, the identity of the would-—be monopolist would be critical in determining the existence of an antitrust injury because it would inform a court’s judgment regarding the quality or quantity of goods or services that consumers could reasonably expect to receive.
However, antitrust injury cannot be predicated on a court’s evaluation of the quality or quantity of a would-be monopolist’s products or services,- rather than on an evaluation of whether competition would be reduced in the relevant market. Cf. Expert Masonry, 440 F.3d at 348 (“[W]e decline to extend antitrust liability to give succor to dejected buyers or sellers who simply allege that one buyer and one seller colluded to reach a deal that may or may not have been inferior to the deal offered by the disappointed party.”). At bottom, JetAway asks the panel to compare the FBO services offered by it and JCP and then to predict which entity’s services would be superior. I decline to engage in this dubious undertaking. And, even if there were some legal foundation for such an exercise, “[a]dministrability considerations” would nonetheless dissuade me from moving down that path. Novell, 731 F.3d at 1073.
Courts lack a principled method to determine which services provide greater benefit to consumers. See Re/Max Int’l, Inc. v. Realty One, Inc., 173 F.3d 995, 1000 (6th Cir.1999) (“Manifestly, the judiciary is ill-suited to evaluate directly the efficiency of business practices.”); cf. Four Corners, 582 F.3d at 1226 (rejecting the notion that the court should force the defendant monopolist to share its monopoly with the plaintiff because, inter alia, “[t]he federal judiciary is not a price control agency”); Four Corners, 582 F.3d at 1226 (“[Antitrust courts normally avoid direct price administration, relying [instead] on rules and remedies ... that are easier to administer.” (second alteration and omission in original) (quoting Town of Concord v. Bos. Edison Co., 915 F.2d 17, 25 (1st Cir.1990)) (internal quotation marks omitted)).
Just as the Supreme Court has acknowledged that the federal courts are “ill suited ‘to act as central planners, identifying the proper price, quantity, and other terms of dealing,’” Pac. Bell Tel. Co. v. Linkline Commc’ns, Inc., 555 U.S. 438, 452, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009) (quot *849 ing Trinko, 540 U.S. at 408, 124 S.Ct. 872), controlling precedent likewise makes clear that courts are ill-suited to determine which of two would-be monopolists would provide better services to consumers, see Novell, 731 F.3d at 1073 (“If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions. That would not only risk judicial complicity in collusion and dampened price competition. It would also require us to become ‘central planners,’ a role for which we judges lack many comparative advantages and a role in which we haven’t always excelled in the past.”); see also Pac. Bell Tel. Co., 555 U.S. at 452, 129 S.Ct. 1109 (noting that the Supreme Court has “repeatedly emphasized the importance of clear rules in antitrust law”).
In the end, this case is simple. JetAway “does not ask us to prevent a monopoly or break one apart,” Four Corners, 582 F.3d at 1226, but asks to be installed as a monopolist. This relief is not available to JetAway, for the identity of the party that necessarily will exercise monopolistic control over the FBO services at the Airport “is a matter of indifference” to the antitrust laws. Brunswick Corp., 752 F.2d at 267. Because JetAway has failed to establish that Defendants’ conduct reduced competition in the Airport’s FBO services market, it cannot establish an antitrust injury. See Elliott Indus., 407 F.3d at 1124-25; Ashley Creek, 315 F.3d at 1254. Accordingly, in my view, the district court correctly granted summary judgment to Defendants on JetAway’s Sherman Act claims.
IV
Finally, given the per curiam disposition of this appeal, I pause to address certain concerns raised by my very esteemed colleague, Judge Tymkovich, in his own concurring opinion (“Tymkovich Concurrence”). Although that opinion accepts the overarching, fundamental conclusion that JetAway has not established the requisite antitrust injury, it declines to “underwrite some of the specifics” of my analysis. Tymkovich Concurrence at 1.
In my view, the approach of the Tymko-vich Concurrence suffers from two salient, critical flaws. First, it improperly predicates its substantive Sherman Act analysis, and its view of the antitrust-injury requirement, on a definition of the relevant market that was never advanced by the parties.[17] And, second, its criticism of this opinion’s perspective on whether an antitrust injury may arise where one monopolist replaces another in a natural-monopoly market proves too much: I expressly acknowledge the possibility that an antitrust injury may result from the conduct of market participants in a “substitute-monopolist” scenario (but under circumstances not present here). See supra n. 12. Thus, I respectfully suggest that this strand of the Tymkovich Concurrence’s reasoning amounts to a misguided attack on a straw man.
A
Antitrust cases frequently present a host of intriguing intellectual detours; that *850 is certainly true here. The Tymkovich Concurrence takes one such detour. But I believe the more prudent course in this case is not to do so. Rather, I would defer to “the principle of party presentation,” which confínes a court’s analysis to issues that the parties have articulated, not topics of the court’s own choosing. Greenlaw v. United States, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008); see Morgan v. McCotter, 365 F.3d 882, 887 (10th Cir.2004) (commenting on the court’s “duty to undertake an independent examination [of] ... the dispute, as framed by the parties ” (emphasis added)); Utah Poultry Producers Co-op. v. Union Pac. R. Co., 147 F.2d 975, 977 (10th Cir.1945) (“[I]t is not necessary for us to decide this [issue], because this is not the issue as framed by the parties.” (emphasis added)).
In light of this enduring legal principle, the Tymkovich Concurrence’s criticism of this opinion’s purported “embrace[]” of a “narrowly defined market,” Tymkovich Concurrence at 4, is puzzling. The antitrust-injury analysis that I have undertaken is predicated.on a relevant market that JetAway itself advanced, that Defendants acknowledged (at least tacitly) as the foundation for their responsive arguments, and that the district court accepted for purposes of adjudicating the summary-judgment issues. In contrast, the contours of the market that the Tymkovich Concurrence sua sponte proffers are entirely a product of the Tymkovich Concurrence’s own hand. While I do not question its assertion that “a federal appellate court has discretion to affirm a grant of summary judgment on any legal grounds supported by the record,” id. at 1 n. 1, given the posture of this case, I believe that the Tymkovich Concurrence’s approach is unwarranted and ill-advised: no one has even hinted at affirming on the alternative grounds it endorses, and the district court did not even have an opportunity to consider, much less rule on, the market that the Tymkovich Concurrence has independently conjured up, see Arizona v. California, 530 U.S. 392, 412-13, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (instructing that “courts must be cautious about raising [issues] sua sponte, thereby eroding the principle of party presentation so basic to our system of adjudication”).
It is well-settled that the plaintiff bears the burden of defining the relevant market, see Tarabishi v. McAlester Reg’l Hosp., 951 F.2d 1558, 1569 n. 15 (10th Cir.1991), and, in so doing, must present competent evidence to “make an affirmative showing of [its] proposed relevant market sufficient to sustain a reasonable jury finding,” Telecor Commc’ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1131 (10th Cir.2002); see Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir.1991) (“[T]he plaintiff must prove ... [the] relevant market (including geographic market and relevant product market) in which the alleged [antitrust violation] occurred.” (quoting Shoppin’ Bag of Pueblo, Inc. v. Dillon Cos., 783 F.2d 159, 161 (10th Cir.1986)) (internal quotation marks omitted)).[18] JetAway never defined the market before the district court in the manner that the Tymkovich Concurrence would have it—-as “the full cluster of interrelated services that the Airport offers,” Tymko- *851 vich Concurrence at 8 (emphasis added)— nor did it name the Airport as the monopolist, see Aplt.App. at 3299 (Pl.’s Resp. Br. to Cnty. Defs.’ Summ. J. Mot., filed Oct. 1, 2011) (“JCP is the monopolist and the last thing JetAway seeks is to join forces with JCP and share in its monopoly.”); id. at 3314-15 (arguing that “direct competition between JCP and JetAway post RFP would have had additional positive impacts on the quality of FBO services” at the Airport).[19] Rather, JetAway repeatedly voiced its view that an alleged “agreement for an exclusive monopoly on fuel sales and FBO services at the Airport [was] consistent with the anticompetitive behavior the Sherman Act prohibits.” Id. at 3322 (emphasis added).
JetAway then sought to substantiate its market definition with Dr. Nelson’s research results. It is patent from even a cursory review of Dr. Nelson’s testimony that he conceived of JCP—and not the Airport—as being the monopolist, and the “relevant market” as being the Airport’s “FBO Market.” Id. at 3186; see id. (“JCP is the only competitor in the relevant market(s), which implies that its market share is 100%.” (emphasis added)); see also id. (concluding “that the FBO services at [the Airport] and associated product-specific submarkets are well-defined relevant antitrust markets (both with respect to a ‘line of commerce’ (product market) and ‘section of the country’ (geographic market))”). And, when Defendants crossed swords with JetAway, framing the issues for decision, they did not challenge this basic definition of the market. See id. at 2836 (Cnty. Defs.’ Summ. J. Br., filed Aug. 31, 2011) (accepting the premise that “JetAway claims entitlement to be the monopolist FBO at the Airport and bases its damage claim entirely upon being denied monopoly status” (emphasis added)). The district court properly reached its conclusions regarding the relevant market by focusing on the parties’ arguments.
The parties also have maintained this perspective regarding the relevant market on appeal. See Aplt. Opening Br. at 3 (“This case arises from Defendants’ concerted efforts to ... monopolize the [FBO] market at the [Airport].” (footnote omitted)). True to form, JetAway has continued to frame its arguments in terms of its ability “to compete as an on-Airport FBO,” id. at 24, and JCP offers no resistance to this description, see Aplee. Opening Br. at 49 (“JetAway’s claimed antitrust injury is that it, rather than JCP, should be the sole FBO at the Airport” (emphasis added)); Aplee. Opening Br. at 59 (discussing Jet-Away’s “alleged lost ‘opportunity’ to operate an FBO at the Airport”).
Yet, with no foothold in the parties’ firmly-established arguments, the Tymko-vich Concurrence purports to reconfigure and redefine the market out of wholecloth. Given “the principle of party presentation,” Greenlaw, 554 U.S. at 243, 128 S.Ct. 2559, this action—as I see it—is improper. It is well-settled that on appeal, this court reviews a district court’s findings regarding the contours of the market under the clearly-erroneous standard. See Westman Comm’n Co. v. Hobart Int’l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986). And, on this record, I believe any reviewing court would be hard-pressed to conclude that the district court clearly erred in accepting for purposes of its summary-judgment ruling a configuration of the relevant market that was congruent with the parties’ argu *852 ments—that is, a version of the relevant market defined as FBO services at the Airport—rather than a definition of the relevant market consistent with the Tym-kovich Concurrence’s creation.
At the end of the day, it is unnecessary for me to determine whether the Tymko-vich Concurrence’s alternative vision of the relevant market is more appropriate. It would not be proper for me to make such a determination, as the task of defining the relevant market was a matter for the parties—not this panel or, more specifically, the Tymkovich Concurrence—to undertake in the first instance. I note that my concurring opinion should not be read as negating the possibility that—were the facts and the parties’ arguments different—-the district court could have determined that the Airport was the relevant market and also the extant monopolist.[20] But, as I see it, that line of reasoning is foreclosed on appellate review, as it was never broached by the parties, much less bolstered by evidence. Therefore, it would be inappropriate—not to mention unfair to the parties—to follow the Tymkovich Concurrence’s speculative course and resolve the case on a newly minted view of the relevant market.
B
The Tymkovich Concurrence also claims to demur to this opinion’s antitrust-injury analysis in that it “cannot agree ... that an upstart in a low-demand, one-firm market can never state an antitrust injury.” Tymkovich Concurrence at 3 (emphasis added). But nor can I. Indeed, it seems patent that the Tymkovich Concurrence misinterprets my antitrust-injury analysis in this regard.
To be clear, as I see it, this concurring opinion does not definitively speak to whether there are circumstances where the antitrust-injury requirement might be satisfied in a monopolist-substitution scenario in a natural-monopoly market. See supra n. 12 (“[T]o the extent that there actually is an open question regarding whether such predatory or exclusionary conduct could give rise to an antitrust injury where the ultimate result is the replacement of one monopolist with another in a natural-monopoly market, I would leave the resolution of that question for another day.”). Again, I find it noteworthy that some commentators have considered the matter an unresolved question. See Davis, supra, at 774-75; cf. Lawrence J. White, Economies of Scale and the Question of “Natural Monopoly” in the Airline Industry, 44 J. Air L. & Com. 545, 573 (1979) (hypothesizing that “[njatural monopoly is not a serious problem for the airline industry,” but cautioning that factors such as “the recent introduction of fare flexibility” suggest the need for “very close scrutiny” (internal quotation marks omitted)). Others have more strongly suggested that such a substitution could give rise to an antitrust injury. See, e.g., Ill Areeda, supra, ¶658b3, at 177-78. On these facts, however, I believe the more advisable approach is to avoid definitively staking out a position on this issue.
Critically, to the extent that an antitrust injury could arise when one monopolist replaces another in a natural-monopoly context, the authorities suggest that such *853 injuries are likely to stem from exclusionary practices that have been historically condemned by the antitrust laws. See, e.g., Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1108 (7th Cir.1984) (“Examples of such offenses include price-fixing schemes, as well as certain types of group boycotts, market allocations, and tying arrangements.”); cf. IA Areeda, supra, ¶ 224e, at 126 (“[Substitution of one monopolist for another is not an antitrust violation; the only compelling cases for antitrust violations occur in the rare instances when the government is a market participant engaging in a horizontal conspiracy with private market participants.”). The principal authorities cited by the Tym-kovich Concurrence actually serve as exemplars of conduct traditionally viewed as inimical to competition. See Hecht v. Pro-Football, Inc., 570 F.2d 982, 991 (D.C.Cir.1977) (holding that a restrictive covenant could implicate the antitrust laws only if “acquired or maintained by exclusionary, unfair, or predatory means” (internal quotation marks omitted)); Greenville Publ’g Co. v. Daily Reflector, Inc., 496 F.2d 391, 393 (4th Cir.1974) (involving allegations that “defendants [had] deliberately set their advertising rates below cost and [had] made deceptive statements ... to eliminate [a rival] from competition” (footnote omitted)); Union Leader Corp. v. Newspapers of New Eng., Inc., 284 F.2d 582, 586 (1st Cir.1960) (reviewing the district court’s finding that one newspaper “resorted to ‘private concessions,’ that is to say, secret discriminatory rates,” which it held “to be an unfair practice evincing an exclusionary intent”). Accordingly, I do not foreclose the possibility that, under certain circumstances, a would-be monopolist in a natural-monopoly market could successfully establish an antitrust injury. I wish to emphasize, however, that this could be true if and only if the would-be monopolist first presented competent evidence of conduct historically condemned as anticompetitive by the antitrust laws. And that is not true in this case.
JetAway has established nothing more than that it sought to supplant JCP as the monopolist in the Airport’s FBO services market—that is, to be the substitute monopolist—and that Defendants allegedly prevented it from doing so by means of various corrupt and unlawful practices. In particular, JetAway has not pointed to, much less offered evidence of, predatory or other exclusionary conduct of the kind that the antitrust laws have historically proscribed.[21] The conduct at issue here *854 more closely resembles that complained of in bid-selection cases. See, e.g., Expert Masonry, 440 F.3d at 348 (observing that “parties may break a host of state or federal laws and regulations in making a side deal or in otherwise circumventing the bidding process” without implicating the antitrust laws). And, as the Supreme Court instructs, “[t]he Sherman Act does not require competitive bidding.” Nat’l Soc’y of Profl Eng’rs, 435 U.S. at 694, 98 S.Ct. 1355.
Alternatively, this case at least arguably might be analogized to the selection of an exclusive distributor for a given market—a species of conduct that also has not been historically condemned by the antitrust laws. See Westman Comm’n Co., 796 F.2d at 1225 (highlighting “[a] manufacturer’s ability to limit its distributorships”); Blankenship v. Herzfeld, 661 F.2d 840, 844 (10th Cir.1981) (defending “[a] supplier[’s] ... right to unilaterally select and terminate its own distributors”); cf. Watkins & Son Pet Supplies v. Iams Co., 254 F.3d 607, 616 (6th Cir.2001) (“To the extent [Plaintiff] is claiming that it suffered an injury as a result of termination of its distributorship, we find ... that while a contract or tort claim might lie, an antitrust claim does not....”); see also Davis, supra, at 742 (“Choosing A over B as one’s exclusive distributor ... is not an antitrust violation at all.”).
Yet, even assuming that some misconduct akin to such bidding or exclusive-distributor selections could rise to the level of an antitrust violation—a reasonable assumption I have made for purposes of my antitrust-injury analysis, see supra n. 9—it is clear that JetAway still would be without redress. The Achilles’s heel for JetAway remains its failure to show that any injury that it has suffered from Defendants’ behavior also has had an anticom-petitive effect. Vague allusions to the quality of FBO services or reduced prices cannot overcome this defect. Cf. NicSand, Inc. v. 3M Co., 507 F.3d 442, 459 (6th Cir.2007) (en banc) (noting that the plaintiff could not demonstrate having “suffered an antitrust injury, as opposed to the ill effects of price competition, which understandably hurts, but which does not by itself state a cognizable antitrust claim,” and that “[ojtherwise, every time an allegedly superior product or a lower-cost alternative was eliminated from the market by competition, the producer of that product *855 would have antitrust standing” (citation omitted) (internal quotation marks omitted)). One commentator’s view of the issue is especially apt when considering Jet-Away’s claims: “No antitrust statute or rule creates a vested right to go on doing business, in perpetuity, in a way that is familiar, comfortable, or profitable.” Davis, supra, at 751.
Furthermore, I underscore that the “substitution-of-monopolist” rule articulated supra is by no means painted in the broad brushstrokes that the Tymkovich Concurrence suggests. This rule does not perforce safeguard the incumbent monopolist; to the contrary, it is clearly indifferent to the identity of the market actors. More specifically, it is indifferent regarding whether the monopoly is ultimately possessed by the incumbent or the challenger. Stated otherwise, under different facts—such as those involving practices historically condemned by the antitrust laws—a firm like JetAway possibly could mount a legally cognizable objection to being excluded from the relevant market. But those facts simply are not present here; so, although in this case the effect of the “substitution-of-monopolist” rule is to insulate the incumbent (JCP) from liability, that would not necessarily be true in different settings.
In sum, the Tymkovich Concurrence proceeds on a false premise: that this opinion completely rejects the possibility of an antitrust injury resulting from one monopolist replacing another in a natural-monopoly setting. This is an untenable mischaracterization of the instant opinion’s reasoning and conclusions. Consequently, although its analysis strives mightily (and might carry the day under different circumstances), I respectfully suggest that the Tymkovich Concurrence has only succeeded in defeating a straw man.
V
For the reasons stated herein, I would AFFIRM the district court’s grant of summary judgment to Defendants.

. JetAway also alleged that Defendants violated various other federal statutes that preclude the granting of exclusive FBO operations, but voluntarily withdrew that claim before the district court.

. The Noerr-Pennington doctrine “exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition.” Tal v. Hogan, 453 F.3d 1244, 1259 (10th Cir.2006) (quoting Zimomra v. Alamo Rent-A-Car, Inc., 111 F.3d 1495, 1503 (10th Cir.1997)) (internal quotation marks omitted); accord Coll v. First Am. Title Ins. Co., 642 F.3d 876, 894 (10th Cir.2011); see generally United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). "The doctrine arises from the [Supreme] Court’s conclusion that the Sherman Act was not intended to derogate the First Amendment right of citizens to petition the government for a redress of grievances.” GF Gaming Corp. v. City of Black Hawk, 405 F.3d 876, 883 (10th Cir.2005).

. State-action immunity, sometimes referred to as Parker immunity, generally immunizes a state from liability under antitrust laws for its anticompetitive behavior. See FTC v. Phoebe Putney Health Sys., Inc., - U.S. -, 133 S.Ct. 1003, 1010, 185 L.Ed.2d 43 (2013). This immunity extends to "substate governmental entities” such as the BOCC "when they act pursuant to state policy to displace competition with regulation or monopoly public service.” Id. (internal quotation marks omitted); see generally Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

. JetAway has declined to pursue on appeal its claims under the Equal Protection and Commerce Clauses by not addressing them in its briefing. Therefore, under our precedent, JetAway has waived any challenge to the district court’s grant of summary judgment to Defendants on those claims. See United States v. Springfield, 337 F.3d 1175, 1178 (10th Cir.2003) (holding that the appellant waived claims not raised on appeal); Grant v. Pharmacia & Upjohn Co., 314 F.3d 488, 494 (10th Cir.2002) (deeming waived a claim raised before the district court but not briefed on appeal).

. "Under Section 1 agreements 'may be illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.' " Elliott Indus. Ltd P’ship v. BP Am. Prod. Co., 407 F.3d 1091, 1123 n. 29 (10th Cir.2005) (emphasis omitted) (quoting Cayman Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357, 1359-60 (10th Cir.1989)).

. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power.” Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1192 (10th Cir.2009) (internal quotation marks omitted).

. The burden to demonstrate antitrust standing is on the plaintiff. See Abraham v. Intermountain Health Care Inc., 461 F.3d 1249, 1267 (10th Cir.2006).

. This court has also looked to the following six factors in assessing a plaintiff's antitrust standing:
(1) the causal connection between the antitrust violation and the plaintiff's injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff’s injury—i.e. whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's injury and the market restraint resulting from the alleged antitrust violation; (5) the speculative nature of the damages sought; and (6) the risk of duplicative recoveries or complex damages apportionment. Sharp v. United Airlines, Inc., 967 F.2d 404, 406-07 (10th Cir.1992); accord Elliott Indus., 407 F.3d at 1124 n. 31; Roman v. Cessna Aircraft Co., 55 F.3d 542, 543 (10th Cir.1995); Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 962 n. 15 (10th Cir.1990). These six factors "validate” and "give more specificity to the inquiry mandated by the two-part test.” Sharp, 967 F.2d at 407 n. 2. I do not delve into the points of intersection of these two tests, however, because I would resolve this case by concluding that JetAway cannot establish the first prong of the two-part test—antitrust injury. Regardless of which test is applied, antitrust injury is a prerequisite to antitrust standing. See Elliott Indus., 407 F.3d at 1124 ("Antitrust injury and antitrust standing are overlapping concepts; '[standing cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing.' ” (alteration in original) (quoting Sharp, 967 F.2d at 406)). Parsing these two tests is unnecessary for the additional reason that the "nature-of-the-plaintiffs-injury” factor of the six-factor test essentially asks whether there was an antitrust injury. See Reazin, 899 F.2d at 962 n. 15 ("The nature of the plaintiff’s injury factor is designed to implement the requirement that only antitrust injuries are redressable under section 4.").

. One commentator asserts that, at least in cases where it is obvious that the plaintiff cannot establish an antitrust violation on the merits, it is a "fool's errand" to engage in an antitrust-injury inquiry. Ronald W. Davis, Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury, 70 Antitrust L J. 697, 732 (2003); see also IIA Areeda, supra, ¶ 335f, at 76 ("Of course, if the substantive doubt [regarding the existence of anticompetitive conduct] is great enough, the court should grant the defendants summary judgment on the merits, but not by denying standing to sue.”). Putting aside the question of whether such a view could be harmonized with our precedent's conception of antitrust injury as a threshold issue, I believe that taking up the antitrust-injury question first under the circumstances of this case is the prudent course: the parties have extensively briefed the issue, and it provides a sound basis for succinctly resolving their dispute. In following this path, however, I "assume the existence of [an antitrust] violation.” IIA Areeda, supra, ¶ 335f, at 75; see Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 437 (2d Cir.2005) (noting that "some courts and commentators have suggested assuming the existence of [an antitrust] violation in addressing the issue of standing”).

. The description of the FBO services market at the Airport offered by JetAway's expert, Dr. Nelson, suggests that the market is akin to a natural monopoly. See, e.g., Nat'l Reporting Co. v. Alderson Reporting Co., 763 F.2d 1020, 1023-24 (8th Cir.1985) ("[A] natural monopoly is a market that can practically accommodate only one competitor. Obviously it cannot be a violation of law to be that one competitor, so long as the company in question has attained its success in the market by business acumen, superior quality, or other means 'honestly industrial.' ” (citing United States v. Aluminum Co. of Am., 148 F.2d 416, *836 429-30 (2d Cir.1945) (L.Hand, J.))); Black’s Law Dictionary 1098 (9th ed.2009) (defining "natural monopoly'' as "[a] monopoly resulting from a circumstance over which the monopolist has no power, as when the market for a product is so limited that only one plant is needed to meet demand''); see also Otter Tail Power Co. v. United States, 410 U.S. 366, 369, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) ("Each town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail.”); Byars v. Bluff City News Co., 609 F.2d 843, 853 n. 27 (6th Cir.1979) (noting that "[t]he classic case is that of a 'natural' monopoly such as that possessed by a utility company in a city” and offering "[ojther examples of a 'natural' monopoly”).

. Because JetAway cannot establish the first prong of antitrust standing (antitrust injury), I see no need to reach the second prong of the antitrust-standing inquiry—namely, whether there is "a direct causal connection between that injury and a defendant’s violation of the antitrust laws,” Ashley Creek, 315 F.3d at 1254 (internal quotation marks omitted)—and do not address that issue.

. I recognize that the Seventh Circuit, as well as some scholarly literature, has raised the possibility that, under certain circumstances, even when the end result will be the replacement of one monopolist by another monopolist in a market that naturally can support only one firm, an antitrust injury may still stem from the anticompetitive conduct exhibited by the rival would-be monopolists. See Fishman, 807 F.2d at 533-35; Davis, supra, at 766, 774-75. In Fishman, the court observed; "Plaintiffs alleged that they were deprived of a fair shot at winning a legal monopoly. There is no reason why this injury is not an antitrust injury unless the Sherman Act does not protect competition to acquire a natural monopoly'—which is precisely what the defendants assert.” 807 F.2d at 533. Relying in significant part on the Supreme Court’s decision in Otter Tail, the Fishman court rejected the defendants' assertion—viz., their view that the Sherman Act does not offer protections against anticompetitive conduct by would-be monopolists vying for ascendancy in a natural-monopoly market. See id. (noting that Otter Tail "involved competition to acquire a natural monopoly and [that the Supreme Court] held that the use of monopoly power to preclude such competition violated the Sherman Act”); see also Otter Tail, 410 U.S. at 377, 93 S.Ct. 1022 ("The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to [destroy] a competitor, all in violation of the antitrust laws.”); Otter Tail, 410 U.S. at 370-71, 93 S.Ct. 1022 (“The antitrust charge against Otter Tail does not involve the lawfulness of its retail outlets, but only its methods of preventing the towns it served from establishing their own municipal systems when Otter Tail's franchises expired.”); cf. Novell, 731 F.3d at 1074 (describing Otter Tail as the "forebearer of [the] essential facilities doctrine” and noting that the doctrine is "controversial”). In this regard, one commentator has noted:
*840 Though the issue seldom arises, one must regard it as an open question whether dirty pool played by one rival in order to keep another rival from gaining a monopoly position counts as antitrust injury in circumstances where there is bound to be a monopoly in any event and the interests promoted by antitrust will not be impacted, one way or another, by which rival wins the monopoly position.
Davis, supra, at 775 (emphasis added).
However, it is important to note that, in the circumstances contemplated by this allegedly open question, a cognizable antitrust injury does not arise from the mere act of substituting one monopolist for another—with no appreciable reduction in competition—but rather from the distinct "predatory or exclusionary activity," id. at 766, of the monopolist defendant that is calculated to effectuate the substitution. See Fishman, 807 F.2d at 535 (noting that "[t]he antitrust laws protect against unlawful, exclusionary conduct to acquire a natural monopoly”); id. at 536 ("[T]he defendants, through the economic leverage provided by their stadium monopoly, succeeded in driving out all competition for ownership of the [Chicago] Bulls. They used a monopoly in one market to foreclose competition in another—a classic violation of the antitrust laws.”); see also Almeda Mall, Inc. v. Hous. Lighting & Power Co., 615 F.2d 343, 354-55 (5th Cir.1980) (noting that the circumstance of Otter Tail "happens when true competition is operative and anticompet-itive activity surfaces”); Byars, 609 F.2d at 858 ("Otter Tail, among other things, refused to deal when small towns proposed to replace it with their own retail power systems. In that case, Otter Tail used its monopoly power in the wholesale power market to prevent the displacement of its (natural) monopoly in the local retail power market.”). However, "[pjredatory pricing appears nowhere in [this] case,” Novell, 731 F.3d at 1074, and JetAway does not cite Otter Tail or Fishman, much less allege the sort of "unlawful, exclusionary conduct,” Fishman, 807 F.2d at 535, present there. Therefore, to the extent that there actually is an open question regarding whether such predatory or exclusionary conduct could give rise to an antitrust injury where the ultimate result is the replacement of one monopolist by another in a natural-monopoly market, I would leave the resolution of that question for another day.

. This is why JetAway’s argument that it "does not seek to replace JCP as the monopoly FBO at the Airport, but to enter the relevant market and compete with JCP" is unavailing. Aplt. Opening Br. at 35. Had JetAway been allowed to compete with JCP in the FBO services market, only one of the two firms would have survived as the sole occupant of the market—the monopolist—after at most a short period of competition. Therefore, ultimately, the only thing JetAway could have hoped to do by entering the market was to displace JCP, not compete with it.

. JetAway attempts to distinguish Columbia River on two distinct grounds, neither of which is persuasive. First, JetAway argues that Columbia River involved the merits of a § 1 claim rather than antitrust injury, and that these two inquiries are distinct. JetAway is correct that "[t]he purpose of the antitrust injury requirement is different” than the § 1 analysis, and thus each "must be shown independently.” Atl. Richfield Co., 495 U.S. at 342, 344, 110 S.Ct. 1884 (internal quotation marks omitted); see Daniel, 428 F.3d at 437 ("[I]t is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it.”). But the Supreme Court has explained how the inquiries overlap. Anticompetitive conduct can have three "interwoven” effects: it "may reduce competition, ... increase competition, and ... may be neutral as to competition.” Atl. Richfield Co., 495 U.S. at 344, 110 S.Ct. 1884. The antitrust-injury requirement is distinct because it is only met “if the loss stems from a competition-reducing aspect or effect of the defendant’s behavior.” Id. If, as in Columbia River, a court holds that certain conduct does not violate the Sherman Act because it does not reduce competition, it follows ineluctably that the same conduct is insufficient to establish antitrust injury, which must find its cause in the "competition-reduc *844 ing aspect or effect of the defendant’s behavior.” Atl. Richfield Co., 495 U.S. at 344, 110 S.Ct. 1884; cf. Davis, supra, at 742 ("Choosing A over B as one's exclusive distributor for a territory is not an antitrust violation at all, because whether A is chosen or B is chosen, competition remains the same. There was no predicate antitrust violation.” (footnote omitted)). Therefore, JetAway's efforts to distinguish Columbia River are misguided.
Second, JetAway asserts that Columbia River, unlike this case, involved a state-sanctioned monopoly. But the reasoning of Columbia River was not dependent on the state-sanctioned status of the monopoly. Moreover, the rationale underlying Columbia River—that competition is not harmed simply by the replacement of one monopolist with another—holds true regardless of whether the monopoly is sanctioned by the state or is dictated by market forces.

. JetAway attempts to distinguish Adaptive Power Solutions, arguing that in that case, following the temporary harm to competition, there was an additional competitor in the relevant market; that is, in the end, competition actually increased. But this fact was not determinative for the Ninth Circuit's ultimate conclusion. Instead, the court focused on the fact that the harm to competition needed to be "more-than-temporary ” and that the harm at issue "was, at most, temporary.” Adaptive Power Solutions, 141 F.3d at 952 (internal quotation marks omitted). The same is true here. Further, and more importantly, this court recognized the very same principle in Colorado Interstate Gas Co. See 885 F.2d at 697.

. In this same vein, JetAway contends that because of Defendants’ anticompetitive exclusion of it from the FBO services market, the prices faced by consumers were higher. Based on the reasoning and authorities explicated supra in Part III.B.2, I find that argument unavailing. In brief, even if I were inclined to find an antitrust injury if it could be shown that Defendants’ allegedly anticom-petitive conduct had the effect of increasing prices for consumers in the long run, JetAway has introduced no evidence to this effect. Jet-Away’s only evidence is that prices would have decreased for a short period during its posited head-to-head competition with JCP. Yet, as noted in Part III.B.2.b, such a temporary effect on prices is of no moment in the antitrust-injury inquiry. See Adaptive Power Solutions, 141 F.3d at 952; Colo. Interstate Gas Co., 885 F.2d at 697. Only one competitor (as between JCP and JetAway) would have emerged as the monopolist in the Airport’s FBO services market, and that surviving competitor would have been "free to reduce output and increase prices, the standard evils of monopoly power.” HyPoint Tech., 949 F.2d at 878. In other words, the decline in prices for consumers caused by competition between JetAway and JCP only would have been short-lived; monopoly power would have been reestablished, and the prevailing monopolist, "as a rational profit-maximizer,” would have sought to extract monopoly profits from consumers, making "[t]he price to the consumer ... the same” as it would have been under the defeated monopolist. See Brunswick Corp., 752 F.2d at 267. Thus, JetAway’s suggestion of an antitrust-injury on this basis— viz., its contention that, due to the allegedly improper exclusion of JetAway's competing presence in the FBO services market, consumers were forced to pay higher prices—is unpersuasive and misguided under the circumstances of this case.

. More specifically, the Tymkovich Concurrence sad sponte and without reference to the parties' arguments restyles the relevant market. This newly minted market provides the foundation for the Tymkovich Concurrence’s substantive Sherman Act analysis, wherein it concludes that JetAway cannot establish a Sherman Act violation. As noted above, I do not reach the merits of JetAway's Sherman Act claims and only address the threshold issue of antitrust injury. I therefore decline to. accompany the Tymkovich Concurrence down a merits path. Nonetheless, for the reasons explicated below, I believe the Tym-kovich Concurrence's decision to sua sponte reconfigure the market is improper.

. Whether the plaintiff has alleged a violation of § 1 or § 2 of the Sherman Act is of no moment; the same burden applies. Compare TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1027 (10th Cir.1992) (requiring proof in a § 1 case that "the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market ” (emphasis added)), with Full Draw, 182 F.3d at 756 ("[T]o state a claim for attempted monopolization under Sherman Act § 2, the plaintiff must plead ... [the] relevant market....” (internal quotation marks omitted)).

. Indeed, in the FAA proceedings referenced in Part III.B.l, supra, the parties' presentation of the issues was the same. See Aplt.App. at 190 (FAA Dir.’s Determination, dated Nov. 6, 2006) (addressing JetAway’s alleged "right to provide FBO services [at] the Airport” (internal quotation marks omitted)).

. In point of fact, I have expressly limited my conclusions to the facts and evidence presented, see supra n. 12—-just as this court did in Christy Sports, 555 F.3d at 1194 n. 2 ("We should not be misread as suggesting the implausibility of a rental ski product market within a reasonably well-defined geographic area. We simply hold implausible Christy's attempt to suggest a product market exists in rental skis for destination skiers, disaggregated from the full destination ski experience.”).

. Notably, the Tymkovich Concurrence seizes upon Professor Areeda's teaching that "competition for a natural monopoly can be just as beneficial to consumers as competition within an ordinary market.” Ill Areeda, supra, ¶ 658b3, at 178. But its reliance on this teaching does not get the Tymkovich Concurrence out of the starting blocks. In particular, it is significant that this language appears in a passage seeking to clarify that an "unlawful exclusionary practice” may give rise to an antitrust injury, even in a natural-monopoly context. Id. at 177 (italics omitted). However, as explained supra, I acknowledge—and do not categorically reject— that same possibility. JetAway’s inescapable problem is that it cannot point to an unlawful practice that has been historically condemned by the antitrust laws as the source of its injury. Likewise, the Tymkovich Concurrence cannot escape the critical fact of this case, as established by JetAway’s own expert, Dr. Nelson: that any benefits to consumers associated with a period of competition between JetAway and JCP would only have been temporary. And, as a matter of law, see supra Part III.B.2, I cannot (and therefore do not) permit these temporary effects to dictate my conclusions regarding whether Defendants’ conduct has had a competition-reducing (i.e., anticompetitive) impact on the Airport’s FBO services market. The Tymkovich Concurrence, however, resists this legal conclusion. It contends that this opinion's reliance on two cases is misguided because those cases involved temporary reductions in competition—see Adaptive Power Solutions, 141 *854 F.3d at 952; Colo. Interstate Gas Co., 885 F.2d at 697—not, as posited here, temporarily enhanced competition, see Tymkovich Concurrence at 13 n.6. However, I offer those authorities only to support the overarching point, which courts have recognized, that in the antitrust arena ordinarily it is not appropriate to predicate any conclusions about the impact of market-participant conduct on temporary effects—irrespective of whether they result in short-term increases or short-term decreases in competition. Such ephemeral effects cannot serve as a reliable bellwether of the overall impact of participants’ conduct on the relevant market, "[i]n part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects.” Copperweld Corp., 467 U.S. at 767-68, 104 S.Ct. 2731; see also Frank H. Easterbrook, The Limits of Antitrust, 63 Tex. L.Rev. 1, 8 (1984) ("[EJxplana-tions may show how cooperative practices (or practices that exclude or harm rivals), which appear at first glance to be restrictive, will have longer-run benefits in competition.”). Furthermore, to the extent that the Tymko-vich Concurrence attempts to posit possible long-term effects of such head-to-head competition between JCP and JetAway, it engages in pure conjecture and speculation, which, par for the course, finds no grounding in the parties’ arguments. See, e.g., Tymkovich Concurrence at 14-15 ("[DJuring the one-year competition period forecasted by JetA-way’s expert, pilots and airlines could play one FBO against the other for the best long-term deals—futures contracts, essentially— thus preserving lower prices for a longer term than the competition period itself.” (emphasis added)).